**INDEPENDENT ENERGY CORPORATION,**
Plaintiff,

v.

**TRIGEN ENERGY CORPORATION,**
Defendant.

**No. 94 Civ. 8995 (WCC).**

United States District Court,
S.D. New York.

Nov. 4, 1996.

Aydelott & Aydelott, Mount Kisco, NY (Christopher P. Keenan, of counsel), for plaintiff.

King & Spalding, New York City (Edward G. Kehoe, of counsel), for defendant.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge:

Plaintiff Independent Energy Corporation filed this diversity action on December 15, 1994. Plaintiff contends that it is entitled to reimbursement of $228,100 plus interest from Defendant Trigen Energy Corporation for expenses that plaintiff allegedly incurred in furtherance of its efforts to develop a construction project in El Salvador. Plaintiff asserts claims against defendant for breach of written and oral promises, common law fraud, failure of consideration, unjust enrichment, and breach of fiduciary duty. Defendant has moved under Fed.R.Civ.P. 56(c) for summary judgment dismissing the complaint or, in the alternative, under Fed.R.Civ.P. 9(b) for an order dismissing plaintiff's common law fraud claim for failure to plead with particularity. Defendant has also moved for partial summary judgment on several of plaintiff's claims in the event that they are not dismissed. For the reasons set forth below, defendant's motion is granted in part and denied in part.

## BACKGROUND

In 1993, the government of El Salvador, through its nationally-owned utility, Comision Ejecutiva Hidroelectrica del Rio Lempa ("CEL"), solicited bids from developers interested in acquiring the right to develop an eighty megawatt electrical generating plant in El Salvador. Pursuant to CEL's bidding process, the bidder selected by CEL would receive the exclusive right, for a fixed period, to negotiate and enter into a "power purchase agreement" with CEL. This agreement would establish the terms and conditions under which the bidder would agree to construct and operate the power plant, and CEL would agree to purchase electricity from that facility.

With a view toward securing the right to develop the Salvadoran project, United Thermal Corporation ("UTC") and Plaintiff Independent Energy Corporation ("IEC"), in conjunction with Desarrollos Energeticos Latino Americanos, S.A. ("DELASA") and La Casa Castro, S.A. (collectively the "Participants") submitted a bid to CEL on behalf of the "IEC/UTC limited partnership."[1] In addition, the Participants posted a $2 million bond as required by CEL. CEL's bidding rules provided that if, after being awarded the project, the successful bidder failed to reach agreement with CEL on the terms of the power purchase agreement by the end of the negotiating period, the bond would be subject to forfeiture.

On February 3, 1994, CEL accepted the Participants' bid but formally awarded the project to IEC and UTC as independent entities, rather than as a limited partnership. Additionally during this period, Defendant Trigen Corporation ("Trigen") acquired UTC, although the parties disagree as to whether Trigen formally completed its acquisition of UTC before or after CEL awarded the project.

Trigen's board of directors harbored reservations about the Salvadoran project and indicated to Trigen's management that the board would not authorize Trigen to proceed unless Trigen secured an equity partner willing to assume a significant share of the project's risk, obtained a source of debt financing, and entered into an engineering, procurement, and construction contract ("EPC contract") with a suitable contractor.[2] By mid-May 1994, Trigen's management had taken steps to comply with its board's requirements. Trigen's management signed a letter of intent with Wartsila Diesel Corporation to enter into an EPC contract and had identified Tenneco Gas International, Inc. as a potential equity partner for the project. Also in May 1994, Trigen signed an agreement with La Casa Castro and DELASA setting forth conditions under which Trigen agreed to enter into the power purchase agreement with CEL on behalf of La Casa Castro and DELASA.[3] Last, Trigen sought to modify the proposed power purchase agreement then under negotiation with CEL in order to provide Trigen with the right to cancel the agreement prior to June 17, 1994 or to assign its interest subject to CEL's approval.

On May 16, 1994, one day before the expiration of the time allotted by CEL for IEC and Trigen to enter into the power purchase agreement with CEL, representatives of IEC and Trigen convened to negotiate IEC's assignment of its project rights to Trigen. Such an assignment would enable Trigen

---

1. IEC and UTC filed a certificate of limited partnership with the Office of the Secretary of the State of Connecticut in January 1994. However, they never executed a formal limited partnership agreement.

2. The parties disagree as to the significance of the requirements mandated by Trigen's board. Plaintiff asserts that Trigen's board intended these requirements to be preconditions to Trigen's signing of the power purchase agreement. Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 15–16 ("Plaintiff's Memorandum"). Defendant, however, contends that the board intended fulfillment of these requirements to be a prerequisite to any continued participation whatsoever by Trigen in the project's initial development stages. Defendant's Rule 3(g) Statement at ¶ 13.

3. The parties dispute the reason for IEC's absence from the agreement between Trigen, La Casa Castro and DELASA. Plaintiff contends that defendant acted surreptitiously and with the purpose of excluding it. However, defendant asserts that plaintiff had previously expressed a desire to be excused from the project and was therefore not included.

alone to sign the power purchase agreement with CEL. At this meeting, IEC's general counsel proposed that Trigen unconditionally promise to reimburse IEC $228,100 for the expenses IEC had incurred in connection with the project. In exchange for Trigen's promise to pay, IEC offered to assign its project rights to Trigen immediately.[4] Trigen's management, however, was unwilling to incur an unconditional obligation to reimburse IEC's expenses, and after a period of negotiations regarding the reimbursement issue, Trigen and IEC reached the following agreement:

> In consideration of the assignment by Independent Energy Corporation ("IEC") of all of its interests in and to the electrical generating plant to be developed in El Salvador (the "Project") pursuant to Adjudicacion Licitacion No. CEL–1304 from Comision Ejecutiva Hidroelectrica del Rio Lempa ("CEL"), dated February 3, 1994, including the right to negotiate a power purchase agreement with CEL (the "PPA"), to Trigen and other good and lawful consideration, the receipt and sufficiency whereof is hereby acknowledged, and not withstanding any release by IEC of claims against Trigen in connection with the bid to CEL, Trigen hereby promises to pay to IEC the sum $228,100.00 on the happening of the second of 1) June 17, 1994 and 2) the date on which Trigen receives the approval of its Board of Directors to fully implement the Project, *provided that*, if Trigen shall not have received such Board approval by December 31, 1994, this promise to pay shall be null and void.

Letter Agreement dated May 16, 1994 attached as Exhibit 3 to Affirmation of Edward Kehoe, dated July 15, 1996 (emphasis in original). In addition, IEC obtained agreements from Trigen, DELASA, and La Casa Castro absolving IEC of any obligations stemming from the Salvadoran project.

The following morning, notwithstanding the recently concluded letter agreement between Trigen and IEC, Trigen's board of directors instructed Trigen's management not to enter into the power purchase agree-

ment with CEL. However, later that day, Tenneco agreed to accept a complete assignment of Trigen's interest under the power purchase agreement. Trigen's board of directors then granted Trigen's management the authority to execute the power purchase agreement and assign Trigen's entire interest in the project to Tenneco.

On May 18, 1994, Trigen did, in fact, enter into the power purchase agreement and assign its rights to Tenneco. Tenneco, however, assumed no obligation to reimburse IEC for its development expenses. Subsequently, Tenneco reassigned the project rights to the Coastal Corporation, which guided the project to its completion.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has held that the entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 266 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those [materials] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. It may discharge that burden merely by "pointing out to the district court [ ] that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554; *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1223–24 (2d Cir.1994).

In order to defeat summary judgment, the nonmoving party must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

**4.** IEC had previously obtained CEL's permission to assign its rights in the project to Trigen.

No genuine issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The burden on the nonmoving party is tempered, however, by the rule that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513.

## II. Plaintiff's Claims

### A. *Breach of Written Contract*

The parties are at loggerheads over the proper interpretation of defendant's obligation under the May 16, 1994 letter agreement. Specifically, they dispute the intent behind, and meaning of, the clause that predicates plaintiff's reimbursement on defendant's board of directors granting approval "to fully implement the Project." Defendant asserts that summary judgment on plaintiff's claim is appropriate because defendant never received the requisite board approval, and therefore, as a matter of law, it is not bound to reimburse the plaintiff.

Defendant contends that the letter agreement unambiguously obligated it to reimburse plaintiff only if defendant's board granted permission to "implement" the Salvadoran project, which, in defendant's view, meant to complete construction of the power facility, and operate the facility after its completion. In support of this interpretation of the clause at issue, defendant adverts to Webster's Ninth Collegiate Dictionary, which defines "implement" to mean "carry out" or "accomplish." Because defendant's board authorized defendant to enter into the power purchase agreement only for the limited purpose of immediately assigning defendant's rights to Tenneco, defendant reasons that it was never authorized to "carry out" or "accomplish" the project.

Defendant contends that its analysis of the letter agreement is reinforced by the parties' inclusion in the letter agreement of the adverb "fully" to modify "implement." According to defendant, this further demonstrates that plaintiff was not entitled to reimbursement unless defendant received board permission to complete, rather than merely to advance, the project. In defendant's view, plaintiff's contention that the board-approval requirement was satisfied when the board permitted defendant to sign the power purchase agreement would render "fully" meaningless.

Not surprisingly, plaintiff ascribes a wholly different meaning to the letter agreement. In plaintiff's view, the condition at issue required only that defendant execute the power purchase agreement by December 31, 1994 and refrain from canceling that agreement during the cancellation period. Nonetheless, plaintiff acknowledges that the letter agreement is ambiguous on its face as to what would trigger the defendant's obligation to reimburse plaintiff. Plaintiff argues, however, that this ambiguity compels the court to deny summary judgment. According to plaintiff, the meaning of an ambiguous contract must be resolved by a finder of fact who has had an opportunity at trial to evaluate evidence of the parties' intentions.

In support of its contention that the letter agreement can reasonably be construed to require only that defendant's board approve the signing of the power purchase agreement and that defendant not subsequently cancel the agreement with CEL, plaintiff deploys several arguments. First, plaintiff asserts that "[i]n the power development industry, the phrase 'to fully implement a project' means to get a power purchase agreement executed because that triggers all of the obligations to actually build and operate the power plant." Plaintiff's Memorandum at 36. In addition to industry custom, plaintiff cites the construction of the letter agreement. Plaintiff observes that, pursuant to the letter agreement, defendant's obligation to reimburse plaintiff did not arise until June 17, 1994, at the earliest. According to plaintiff, the letter agreement refers to June 17, 1994 because that was the date until which defendant was entitled under the power purchase agreement to cancel that agreement with CEL. Plaintiff reasons that the letter agreement's board-approval requirement "also refers to the [power purchase agreement]. If

it did not, the date of June 17, 1994 would be rendered meaningless." *Id.* at 36.

Last, plaintiff argues that its interpretation of the letter agreement is consistent with what the parties in fact intended. Plaintiff asserts that, prior to entering into the disputed letter agreement, defendant had clearly indicated that it wished to assign its rights under the power purchase agreement. Plaintiff maintains that, knowing defendant's intentions, plaintiff would not have entered into an agreement that was predicated upon defendant receiving approval from its board to participate in the project until its completion. Moreover, according to plaintiff, at the time defendant assigned its rights to Tenneco, defendant also attempted to assign to Tenneco the obligation to reimburse plaintiff. This, in plaintiff's view, evinced defendant's own understanding that it was bound to reimburse plaintiff after signing the power purchase agreement.

■ It is axiomatic that the objective of contract interpretation is to give effect to the parties' clearly expressed intentions. *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990); *Slatt v. Slatt,* 64 N.Y.2d 966, 488 N.Y.S.2d 645, 646, 477 N.E.2d 1099, 1100 (1985). Where the language of a contract is unambiguous, the question of interpretation is one of law, and summary judgment may be granted. *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). In such cases, "the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible." *International Klafter Co., Inc. v. Continental Cas.*

*Co.,* 869 F.2d 96, 100 (2d Cir.1989) (citations omitted); *W.W.W. Assoc., Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 641 (1990) (extrinsic evidence may not be considered in order to create an ambiguity). However, where contractual language is ambiguous, and where there is conflicting extrinsic evidence relevant to the parties' actual intent, a material question of fact exists, and summary judgment should be denied. *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 528 (2d Cir.1990); *Heyman v. Commerce & Industry Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975).

■ Under New York law,[5] the determination of whether a contract term is ambiguous is a threshold question for the court. *Walk–In Med. Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987). A contractual phrase is ambiguous as a matter of law if it is capable of "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." *Id.* (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987, 994 (S.D.N.Y.1968)). By contrast, language that has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion," is unambiguous. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Insurance Co. of North America,* 46

**5.** The parties agree that New York law governs their dispute. Because this court is sitting in diversity jurisdiction and the lawsuit was commenced in the Southern District of New York, New York choice of law principles govern. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York courts, in construing contracts, would apply the law of the jurisdiction having the greatest interest in the litigation. *See J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,* 37 N.Y.2d 220, 333 N.E.2d 168, 172, 371 N.Y.S.2d 892, 898, *cert. denied,* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975). Here, the parties negotiated and entered into the letter agreement in New York, and defendant's principal place of business was in New York. Although neither party advo-

cates the application of Connecticut law, we note that the parties filed a certificate of limited partnership in Connecticut and that their proposed partnership agreement contained a Connecticut choice of law provision. However, the parties never executed that partnership agreement, and there is no indication that they otherwise reached an agreement as to which state's law would apply to their dealings. We thus conclude that New York law controls because the most significant contacts with the dispute are in New York and New York's interest in regulating business conducted within its borders exceeds any interest Connecticut might have in this matter. *See Crescent Oil & Shipping Services v. Phibro Energy, Inc.,* 929 F.2d 49, 52 (2d Cir.1991).

N.Y.2d 351, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978)). Moreover, the language of a contract is not made ambiguous simply because the parties urge different interpretations. *Wards Co., Inc. v. Stamford Ridgeway Assoc.,* 761 F.2d 117, 120 (2d Cir. 1985). Nor does ambiguity exist where one party's view "strain[s] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 141 N.E.2d 590, 593, 161 N.Y.S.2d 90, 92 (1957).

■ Mindful of these precepts, we turn to examine the critical language at issue in the letter agreement. If, as defendant contends, a plain reading of the letter agreement admits of no other conclusion than that the obligation to reimburse plaintiff depended upon board approval for defendant to participate in the project until completion of the plant, summary judgment is appropriate because plaintiff concedes that defendant's board never granted such broad approval. However, if the agreement's language is also reasonably susceptible of plaintiff's interpretation, then the agreement is ambiguous, and the parties must be permitted to introduce extrinsic evidence to clarify the agreement.

We are unpersuaded by plaintiff's contention that because the letter at one point agreement refers to June 17, 1994—the date until which the power purchase agreement permitted defendant to cancel its contract with CEL—this somehow compels the conclusion that the defendant's board of directors satisfied the letter agreement's approval requirement when it granted permission for defendant to sign the power purchase agreement. Whatever the significance of June 17, 1994, might be, the parties' unstated reasons for agreeing that defendant's reimbursement obligation would not ripen until that date are not relevant at this point. On its face, the reference to June 17, 1994, indicates only that the parties intended that a period of time should transpire before the defendant's duty to perform would arise. Also unhelpful are plaintiff's conclusory assertions that the power plant industry's practice is to deem a project fully implemented when the parties sign a power purchase agreement.

Plaintiff offers no persuasive evidence of custom, usage, or business practice bearing on the significance of the power purchase agreement. *See Baker's Aid v. Hussmann Foodservice Co.,* 730 F.Supp. 1209, 1212–13 (S.D.N.Y.1990) (finding disputed term unambiguous in part because of defendant's failure to offer relevant evidence of business custom).

Nonetheless, we find that the clause at issue, and in particular the word "implement," are not so wholly unambiguous as to render plaintiff's claim capable of disposition on summary judgment. On its face, defendant's reading of the disputed clause is not implausible. We do not doubt that "approval ... to fully implement the Project" could be construed to require permission from defendant's board of directors to carry the power plant project to the point of completion. However, it is also reasonable to conclude, as plaintiff urges, that the clause at issue was satisfied when the board of directors authorized defendant to take the decisive step of signing the power purchase agreement, which arguably ensured that the project would eventually come to fruition. This interpretation is consistent with The American Heritage Dictionary's definition of "implement": "To provide a definite plan or procedure to ensure the fulfillment of". *The American Heritage Dictionary* (New College ed. 1976), *see Webster's Third New International Dictionary* (1971) (defining "implement," *inter alia,* as "to give practical effect to and ensure of actual fulfillment by concrete measures"). Given that the interpretation propounded by plaintiff is consistent with one of the ordinary meanings attributable to the word "implement," we are not persuaded that the presence of "fully" in the board-approval clause removes the letter agreement's inherent ambiguity and imbues the clause with a precise meaning.

Having determined that the letter agreement admits of more than one reasonable interpretation, we next examine extrinsic evidence of the parties' intent in order to determine whether there is a genuine issue of material fact as to their understandings of the letter agreement's meaning. *See Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d

425, 428–30 (2d Cir.1992). In *Burger King,* 893 F.2d at 528, the Second Circuit considered an ambiguous agreement and stated that "[s]ummary judgment normally is inappropriate when a contractual term is ambiguous because 'a triable issue of fact' exists as to its interpretation." *Id.* (quoting *Leberman v. John Blair & Co.,* 880 F.2d 1555, 1559 (2d Cir.1989)). Of course, it is consistent with the Second Circuit's view to conclude that summary judgment would be appropriate if, after all the facts alleged to be material to the meaning of an ambiguous contract have been presented, a rational factfinder could only find for the movant. *Pryor v. USX Corp.,* 806 F.Supp. 460, 463 (S.D.N.Y. 1992). In other words, if defendant in this case were able to present undisputed extrinsic evidence that buttressed its interpretation of the letter agreement to such an extent that no reasonable fact-finder could resolve the ambiguity against defendant, that would constitute grounds for summary judgment. *Id.; see Adipietro v. Chubb Life American,* 736 F.Supp. 29, 32–3 (E.D.N.Y.1990) (considering extrinsic evidence of the parties' intent with regard to an ambiguous agreement). However, where the parties present conflicting evidence of intent, "the district court may only identify the issues at the summary judgment stage, not resolve them." *Burger King,* 893 F.2d at 528.

■ Here, plaintiff proffers evidence sufficient to establish the existence of a material issue of fact as to what the parties intended would trigger defendant's duty to reimburse plaintiff. Specifically, plaintiff offers an April 28, 1994 agreement between defendant, La Casa Castro and DELASA, ("three party agreement") which states that "Trigen agrees, if and only if the PPA is executed by the parties thereto, to reimburse fifty percent of the reasonably documented expenses of the parties incurred in connection with the Project...." April 28, 1994 Agreement, ¶ 8 attached as Exhibit 24 to Keenan Declaration. According to plaintiff, the reimbursement clause in the three party agreement was derived from an earlier proposed, but ultimately unconsummated, agreement between plaintiff, defendant, La Casa Castro, and DELASA. Thus, plaintiff reasons that the provision in the three party agreement

predicating La Casa Castro's and DELASA's reimbursement on defendant's signing of the power purchase agreement, supports the conclusion that defendant's obligation to reimburse plaintiff was similarly dependent upon defendant's signing of the power purchase agreement.

In addition, plaintiff cites the deposition testimony of Eugene Murphy, defendant's general counsel, who was present during the May 16, 1994 negotiations that gave rise to the letter agreement. In his deposition testimony, Mr. Murphy states that he understood that the disputed term "to fully implement" would be satisfied if, within thirty days after signing the power purchase agreement, defendant obtained Tenneco's agreement to act as a partner in the project. Plaintiff's exhibit 19 at 138–39. Mr. Murphy's testimony, according to plaintiff, clearly belies defendant's contention that defendant intended to reimburse plaintiff only if it remained a participant in the project until completion. Plaintiff also offers the deposition testimony of several of its employees who aver that the parties had agreed that reimbursement hinged primarily upon defendant's signing of the power purchase agreement. Last, plaintiff observes that when defendant assigned its interest in the project to Tenneco after entering into the power purchase agreement with CEL, the defendant acceded to Tenneco's demand that the assignment agreement include the following statement:

> Nothing herein shall be construed as an agreement by [Tenneco Gas International] to be responsible for any other obligations or liabilities of Trigen relating to or arising from the Project, including but not limited to, any obligation of Trigen to reimburse IEC for its expenses relating to the Project.

Letter from Tenneco Gas International, Inc., dated May 17, 1994 attached as Exhibit 18 to Kehoe Affirmation. Plaintiff argues that this disclaimer demonstrates defendant's and Tenneco's recognition of the fact that plaintiff was already entitled to reimbursement at the time defendant assigned its rights to Tenneco.

Although defendant disputes plaintiff's contentions, we are required to accept the nonmovant's evidence and draw all reasonable inferences in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. Thus, while we do not purport to determine the meaning of the letter agreement or pass on the merits of plaintiff's claim, we do conclude that when viewed in the light most favorable to plaintiff, the letter agreement is ambiguous and summary judgment is inappropriate.

### B. *Breach of Oral Agreement*

Plaintiff alleges that defendant breached an oral agreement to pay the development expenses plaintiff incurred in connection with the Salvadoran project. According to plaintiff, between January and May 1994, defendant and its predecessor in the project, United Thermal Corporation ("UTC"), made a series of oral promises to reimburse plaintiff in exchange for plaintiff's continued efforts to negotiate a power purchase agreement with CEL. Plaintiff asserts that UTC promised to reimburse plaintiff unconditionally but that subsequently Trigen agreed to pay plaintiff only upon execution of the power purchase agreement.

In support of its theory that the parties entered into an oral contract prior to the letter agreement of May 16, 1994, plaintiff offers deposition testimony to that effect by Robert McVay.[6] Plaintiff also contends that the existence of an oral contract is evidenced by the fact that plaintiff submitted detailed statements of its development expenses to defendant. Plaintiff maintains that it would not have provided this information to defendant had defendant not consented to reimburse plaintiff. Last, plaintiff points to several internal Trigen memoranda, which plaintiff contends demonstrate Trigen's acknowledgment of its oral promises to reimburse plaintiff.

In its motion for summary judgment, defendant argues that there is no basis to conclude that the parties entered into an oral agreement. Defendant also asserts that, even assuming the existence of such an agreement, the terms of that agreement are inadmissible because plaintiff offers them in order to contradict the subsequent written agreement of May 16, 1994.

The first issue the court must address is whether plaintiff has presented evidence sufficient to create a question of fact as to the existence of an oral agreement between the parties. If so, we must then inquire into the relationship between the alleged oral agreement and the subsequent letter agreement.

Although plaintiff asserts that defendant made numerous promises to reimburse plaintiff, it is unclear from plaintiff's submissions when exactly the oral agreement between the parties is alleged to have arisen. Even assuming that defendant did offer to reimburse plaintiff, a showing that the parties shared a meeting of the minds regarding the alleged oral agreement's material terms and that the parties intended to be bound is required to establish the existence of the agreement. *Oscar Productions, Inc. v. Zacharius,* 893 F.Supp. 250, 255 (S.D.N.Y.1995); *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 417 N.E.2d 541, 436 N.Y.S.2d 247, 249–50 (1981). On this point, Mr. McVay's deposition statements regarding the parties' intentions are revealing:

Q. Did you have an understanding as to what [Trigen's representatives] meant when they said we'll pay you when the project goes forward?

A. I've told you we had no understanding because they refused to negotiate our contract with us.

Q. Okay.

A. We submitted drafts, yes. Did we have an understanding, no.

Q. Okay. And at the May 16th meeting did the parties finally come to an understanding regarding expense reimbursement?

A. Yes.

McVay Deposition at 113 attached as Exhibit 1 to declaration of Christopher P. Keenan.

---

**6.** Mr. McVay served as plaintiff's vice president until January 1994. Subsequent to his resignation, Mr. McVay acted as an independent contractor on plaintiff's behalf. He has since returned to plaintiff's employ.

It appears that even Mr. McVay, upon whose testimony plaintiff principally relies, did not believe that the parties ever reached an oral agreement on the issue of reimbursement. Moreover, the parties' conduct at the May 16, 1994 meeting belies the contention that there was any prior binding agreement. At that meeting, plaintiff submitted a proposed letter agreement that unconditionally obligated defendant to pay plaintiff's expenses in exchange for plaintiff's assignment of its rights in the project to defendant. Defendant rejected this proposal, and the parties subsequently negotiated a letter agreement, which, without referring to any prior oral agreement, predicated reimbursement, in part, upon approval of defendant's board of directors to "to fully implement the Project."

■ Although the foregoing establishes a sound basis to conclude that the parties never orally entered into a reimbursement agreement, several of defendant's internal communications do reflect defendant's acknowledgment that it had at least some obligation to pay the development expenses of all of the participants in the project. For example, defendant's April 1, 1994 "Project Overview" states that "UTDC is responsible for payment of all out-of-pocket expenses. To date, UTDC estimates the development team has incurred approximately $250,000 of legal, travel and other out-of-pocket expenses." El Salvador IPP Project, Project Overview, dated April 1, 1994 attached as Exhibit 18 to Keenan Declaration. In addition, by furnishing documentation of its development expenses to defendant, plaintiff arguably manifested an intent to be bound by the purported oral agreement. Thus, because the question of contractual intent is largely one of fact, *See Four Seasons Hotels, Ltd. v. Vinnik,* 515 N.Y.S.2d 1, 5–6, 127 A.D.2d 310 (1st Dept.1987), and because "ambiguities or inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the summary judgment motion," *see, e.g., Lane v. New York State Elec. & Gas Corp.,* 18 F.3d 172, 176 (2d Cir.1994) plaintiff has offered evidence sufficient to require that the issue of the parties' intentions be resolved by the trier of fact. *See Bauman Assoc., Inc. v. H & M Int'l Transport,* 567 N.Y.S.2d 404, 408, 171 A.D.2d 479 (1st Dept.1991) (stating that "the issue of whether or not the parties ever came to a meeting of the minds so as to have entered into an enforceable agreement should properly be left to the determination of the trier of facts").

■ We turn next to the relationship between the parties' purported oral agreement and the May 16, 1994 letter agreement. Plaintiff's position on this issue is opaque. According to plaintiff:

Although the parties never reached an 'understanding' in writing concerning Trigen's reimbursement of IEC's development expenses before May 16, 1994, UTC/Trigen representatives consistently made unconditionally oral promises to reimburse IEC's development expenses.... After Trigen acquired UTC, the oral representations changed. Trigen promised to reimburse IEC's expenses when the PPA was signed....

IEC alleges Trigen's oral promise to pay the expenses of IEC upon the signing of the [power purchase agreement]. [IEC] is not seeking to enforce an unconditional promise to pay, though initially Trigen's predecessor, UTC, made such unconditional promises. Accordingly, Trigen's prior oral agreements do not conflict with the terms of the May 16, 1994 letter agreement, and as such they should not be rejected by the Court.

Plaintiff's Memorandum at 40–41. Thus, the gravamen of plaintiff's claim appears to be that the purported oral agreement survived the subsequent written agreement addressed to the same subject and that the oral agreement is separately enforceable.

■ Plaintiff's claim for breach of the purported oral agreement must fail. Under New York law, a subsequent contract regarding the same subject matter supersedes the prior contract. *Barnum v. Millbrook Care Ltd. Partnership,* 850 F.Supp. 1227, 1236 (S.D.N.Y.1994). Prior agreements and negotiations are deemed to merge and be subsumed in a later written agreement. *Shubin v. Surchin,* 27 A.D.2d 452, 455, 280 N.Y.S.2d 55, 59 (1st Dept.1967); *Shapiro v. Shapiro,*

455 N.Y.S.2d 157, 160, 116 Misc.2d 40, 44 (Sup.Ct.1982). Here, plaintiff assented to the May 16, 1994 letter agreement. As a result, the letter agreement supersedes any rights plaintiff may have had under the prior oral agreement. *Barnum*, 850 F.Supp. at 1236.

As we understand plaintiff's claim, the alleged oral agreement obligated plaintiff to assist defendant in negotiating the power purchase agreement in exchange for which defendant promised to reimburse defendant's expenses when the power purchase agreement was signed. By contrast, under the letter agreement, plaintiff assigned all of its rights in the Salvadoran project to defendant in exchange for defendant's promise to reimburse its expenses. Thus, it would appear that the agreements are inconsistent in that under the letter agreement defendant agreed to pay plaintiff's expenses in exchange for plaintiff's assignment of its rights in the project, rather than in exchange for plaintiff's assistance in finalizing the power purchase agreement.

 Under New York law, a contract that appears complete on its face is an integrated agreement as a matter of law. *Adler & Shaykin v. Wachner*, 721 F.Supp. 472, 476–77 (S.D.N.Y.1988). However, in the absence of a merger clause, "the court must determine whether or not there is an integration 'by reading the writing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in writing." *Id.* at 476 (quoting *Braten v. Bankers Trust Co.*, 60 N.Y.2d 155, 468 N.Y.S.2d 861, 864, 456 N.E.2d 802, 805 (1983)). When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete integration of that contract, the parol evidence rule effectively bars any action to enforce a prior inconsistent oral agreement. *See Garza v. Marine Trans. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988); *Doherty v. New York Telephone Co.*, 609 N.Y.S.2d 306, 307, 202 A.D.2d 627 (2d Dept.1994).

 Having examined the letter agreement and the circumstances surrounding it, we conclude that the parties intended the letter agreement to address fully the issue of defendant's reimbursement of plaintiff's development expenses. Although the document contains no merger clause, it contains the words: "In consideration for the assignment by Independent Energy Corporation (IEC) of all its interests in and to the electrical generating plant ... and other good and lawful consideration, the receipt and sufficiency whereof is hereby acknowledged...." These words indicate an intention to treat comprehensively the issue of reimbursement and to be bound only by the terms of the written agreement. *See Adler & Shaykin*, 721 F.Supp. at 476–77 (enumerating the factors New York courts consider in determining whether there is an integration). Moreover, the document, which the parties negotiated with aid of counsel, makes no reference to any prior oral agreement. *Id.*

Thus, plaintiff's claim for breach of the alleged oral agreement runs afoul of the parol evidence rule because the oral agreement's terms differ significantly from those of the integrated letter agreement. As discussed above, plaintiff may offer parol evidence only to explain the ambiguity in the letter agreement. "Then, the evidence is not considered to vary or contradict the terms of [the] integrated agreement; rather, the parol is used to determine what the terms of the agreement are." *Garza*, 861 F.2d at 27 (citation omitted). However, plaintiff may not bring a separate claim to enforce the antecedent oral agreement. Plaintiff's breach of contract claim must succeed or fail on the basis of the written instrument.

Based upon the above analysis, defendant's motion for summary judgment dismissing this claim is granted.

### C. *Fraud*

In the third count of its complaint, plaintiff alleges that in May 1994 defendant knowingly made false material representations to plaintiff, "including but not limited to, representations that Trigen's Board of Directors would consider the full implementation of the Project at its next scheduled Board Meeting in June, 1994." Complaint at ¶ 70. Plain-

tiff's complaint further alleges that defendant made these false representations to induce plaintiff to execute the May 16, 1994 letter agreement and that, in reasonable reliance on defendant's representations, plaintiff did so. As a result, according to plaintiff, it suffered damages of at least $228,100.[7]

In its response papers, plaintiff has fleshed out the basis of its claim. According to plaintiff, there is evidence, in the form of a May 13, 1994 Trigen memorandum, that reveals defendant's intent to assign its rights "in whole or in part to Tenneco" following execution of the power purchase agreement. Plaintiff's Memorandum at 43 (quoting Trigen memorandum). Plaintiff thus contends that defendant committed fraud by "intentionally misleading IEC into believing that Trigen intended, as of May 16, 1994, *not* to assign all of its rights and interest in the project to Tenneco." Plaintiff's Memorandum at 42 (emphasis in original).

In plaintiff's view, defendant's conduct must be deemed fraudulent if, as defendant has asserted in responding to plaintiff's breach-of-contract claims, reimbursement under the letter agreement depended upon defendant's board of directors permitting defendant to participate in the Salvadoran project until its completion.[8] In substance, plaintiff claims that it was fraudulent for defendant's representatives to induce plaintiff to enter into the letter agreement, which predicated payment of plaintiff's expenses on defendant receiving its board's permission to participate in the project, because defendant's management had, during the negotia-

tion period, already resolved to assign defendant's rights to Tenneco.

Defendant counters that plaintiff has failed to adduce any evidence to support the allegations that prior to May 17, 1994, defendant's management had reason to know that its board of directors would not fully consider allowing defendant to continue as a participant in the project or that defendant's management intended to assign defendant's rights in the project to Tenneco. Defendant maintains that its officers did not decide to assign defendant's rights to Tenneco until after its board of directors unexpectedly ordered that the project be abandoned. Defendant thus asserts that there is no basis on which a reasonable jury could conclude that defendant's representatives knowingly misstated defendant's intentions regarding the project. Defendant seeks summary judgment dismissing plaintiff's cause of action for fraud. In the alternative, defendant urges that the fraud claim be dismissed because plaintiff has failed to plead fraud with particularity as required by Fed.R.Civ.P. 9(b).

Plaintiff's complaint alleges that defendant made false representations "with an intention to deceive IEC and induce IEC to execute" the letter agreement. Thus, although plaintiff did not expressly denominate it as such, plaintiff has, in substance, alleged the tort of fraudulent inducement. Under New York law, acts that give rise to a breach of contract claim may also support a distinct claim for fraud if the defendant misrepresents a presently existing fact. *PI, Inc. v. Quality Products, Inc.*, 907 F.Supp. 752, 760–61 (S.D.N.Y.1995) (citing cases). According-

---

7. Plaintiff also alleges a "confidential and fiduciary relationship of trust between IEC and UTDC/Trigen." Complaint, ¶ 70.

8. Plaintiff's fraud claim contains no language to suggest that plaintiff intended this allegation to be construed as a pleading in the alternative. Nonetheless, in responding to defendant's motion for summary judgment regarding the fraud claim, plaintiff proceeds on the assumption that "Trigen's promise to pay IEC was conditioned on Trigen's Board approval for Trigen to remain in the Project as an equity investor through actual construction and operation...." Plaintiff's Memorandum at 42. We note that on this assumption, which is contrary to plaintiff's position as stated in its breach-of-contract claim, defen-

dant would not be in breach of the letter agreement. However, plaintiff must concede this assumption for purposes of its fraud claim because defendant's allegedly fraudulent misrepresentations regarding its intention not to assign the project would be immaterial, and therefore not actionable in fraud, if satisfaction of the letter agreement's conditions depended only upon defendant receiving approval from its board of directors to sign the power purchase agreement. Clearly, any misrepresentations by defendant regarding assignment of its interests would have little bearing on plaintiff's decision to enter into an agreement that did not hinge upon defendant receiving permission to become a permanent participant in the project.

**1198**

ly, "a contracting party can be held liable for fraud if, at the time of contracting, the party made a false statement of intention that 'relates to an agreement between the parties.'" *Id.* (quoting *Graubard Mollen Dannett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 629 N.Y.S.2d 1009, 1014, 653 N.E.2d 1179, 1184 (1995)).

To recover under a theory of fraudulent inducement, plaintiff must prove the following elements: (1) misrepresentation of a material fact; (2) falsity of the representation; (3) scienter; (4) reasonable reliance; and (5) damages. *May Dep't Stores Co. v. International Leasing Corp., Inc.,* 1 F.3d 138, 141 (2d Cir.1993); *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir. 1980). In its motion for summary judgment, defendant does not challenge plaintiff's assertions that the representations at issue were material, that plaintiff reasonably relied on them, or that plaintiff suffered a loss. Nor does defendant expressly deny in its Memorandum of Law that its representatives may have made the representations alleged by plaintiff. Rather, defendant bottoms its motion on the contention that the representations at issue were, in fact, not false at the time defendant's representatives were alleged to have made them. According to defendant, its representatives entered into the letter agreement on May 16, 1994 fully intending that defendant would remain a participant in the project and without knowledge that the board of directors would reject the Salvadoran project at an unscheduled meeting the following day.

Plaintiff, however, has offered proof upon which a trier of fact could reasonably conclude that in the days preceding May 16, 1994, members of defendant's management had, at the least, seriously entertained the possibility of assigning defendant's rights to Tenneco after defendant executed the power purchase agreement with CEL. A May 13, 1994 memorandum from James Abromitis, former president of UTC and currently president of Trigen Baltimore, to three of defendants executives,[9] as well as to repre-

sentatives of Tenneco and La Casa Castro, proposes that defendant seek to add the following language to the power purchase agreement then under negotiation:

It is Trigen's intention to which CEL is in agreement to assign this Agreement in whole or in part to Tenneco Gas International (?) or to another permitted assignee subject to CEL's prior approval of Tenneco's scope of work and level of participation.

Memorandum from J. Abromitis dated May 13, 1994 attached as Exhibit 30 to Keenan Declaration.

It is true that Mr. Abromitis' memorandum suggests language giving defendant the right to assign its interest "in whole or in part" to Tenneco, while the clause agreed upon by defendant and CEL on May 18, 1994, unequivocally states that defendant intends "to assign all of its rights and obligations under the Agreement to an affiliate of Tenneco Gas International, Inc." Power Purchase Agreement between Trigen and CEL, Art. 21(d) attached as Exhibit 19 to Kehoe Affirmation. Nevertheless, as plaintiff contends, the memorandum does suggest that defendant's representatives may have intended, prior to May 17, 1994, to assign defendant's entire interest in the project to Tenneco. Drawing all inferences in favor of plaintiff, as we must in evaluating defendant's motion, plaintiff has adduced circumstantial evidence that raises a genuine issue as to whether defendant's representatives knowingly gave plaintiff false assurances that defendant would not assign its interests to Tenneco and that defendant's board of directors would fully consider granting defendant approval to participate in the project.

Having found that plaintiff's fraud claim is potentially viable, we next consider defendant's motion to dismiss under Rule 9(b). Rule 9(b) mandates that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). In order to plead fraud with particularity, a plaintiff must "state precisely what material

---

**9.** Those employees of defendant who were listed as recipients of the memorandum were: Eugene Murphy, defendant's general counsel; Jean Ma-

lahieude, defendant's vice president of engineering; and Thomas Casten, defendant's president and chief executive officer.

misstatements were made, the time and place of each misstatement, the speaker, the content, the manner in which the statement was misleading, and what the defendants 'obtained' as a result of the fraud." *Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.,* 933 F.Supp. 347, 356 (S.D.N.Y.1996) (quoting *Morin v. Trupin,* 823 F.Supp. 201, 205 (S.D.N.Y.1993)).

■ Plaintiff's complaint states that "[o]n or about" May 16, 1994, "defendant" made material representations "including but not limited to," representations that defendant's board of directors would consider the Salvadoran project at the board's June 1994 meeting. The complaint thus fails to satisfy the requirements that it indicate precisely what all of the alleged misstatements were, the time and place of such misstatements, and the speaker. Nevertheless, to grant defendant's motion in this case would be to reward defendant for not bringing its Rule 9(b) motion in a more timely manner. *See Ramapo Land Co., Inc. v. Consolidated Rail Corp.,* 918 F.Supp. 123, 127–28 (S.D.N.Y.1996). Ordinarily, we would grant leave to amend a claim that is dismissed for failure to satisfy Rule 9(b). However, if we were to grant defendant's motion, plaintiff would be denied its opportunity to amend its claim because of the imminent trial. In addition, defendant is not confronted with the type of conclusory or speculative allegations against which Rule 9(b) seeks to guard. *See Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972). Defendant has filed a responsive pleading in this matter and has had ample opportunity through discovery to ascertain the full factual basis of plaintiff's fraud claim. Accordingly, defendant's motion to dismiss under Rule 9(b) is denied.

D. *Failure of Consideration and Unjust Enrichment*

In the instant case, plaintiff has not responded to defendant's motion for summary judgment on the claims of failure of consideration and unjust enrichment. Federal Rule 56(e) requires plaintiff to go beyond its pleadings in order to defend against a motion for summary judgment:

When a motion for summary judgment is made and supported as provided in the rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*See also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.' "). However, entry of summary judgment is inappropriate, "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, ... even if no opposing evidentiary matter is presented." Fed. R.Civ.P. 56(e) advisory committee's notes (1963 amendment).

1. Failure of Consideration

■ "Failure of consideration exists wherever one who has promised to give some performance fails without his or her fault to receive in some material respect the agreed quid pro quo for that performance. Failure of consideration gives the disappointed party the right to rescind the contract." *Fugelsang v. Fugelsang,* 517 N.Y.S.2d 176, 177, 131 A.D.2d 810 (2d Dept.1987) (citation omitted). Where a plaintiff has received little or nothing of value, recision based upon failure of consideration is warranted. *See Yochim v. Mount Hope Cemetery Ass'n,* 623 N.Y.S.2d 80, 82, 163 Misc.2d 1054 (N.Y. City Ct.1994). However, a partial failure of consideration may not be sufficient to justify recision. 22 N.Y.Jur.2d, Contracts, § 500.

■ In the instant matter, defendant asserts that plaintiff's claim must fail because plaintiff received adequate consideration. We agree with defendant that plaintiff bargained for and obtained a conditional promise from defendant to reimburse plaintiff's development expenses. It is well settled that, "when a man acts in consideration of a condi-

tional promise, if he gets the promise he gets all that he is entitled to by his act, and if, as events turn out, the condition is not satisfied, and the promise calls for no performance, there is no failure of consideration." R.A. Lord, *Williston on Contracts,* Vol. 3 § 7:18 at 346–47 (14th ed. 1992) (quoting *Gutlon v. Marcus,* 165 Mass. 335, 43 N.E. 125 (Mass. 1896)); *See Madison Square Garden v. Carnera,* 52 F.2d 47, 49 (2d Cir.1931) (citing *Gutlon* ). In addition, plaintiff does not dispute that it received general liability releases from defendant, La Casa Castro, and DELASA in exchange for assigning its project rights to defendant. Thus, because plaintiff has failed to raise any genuine issues of material fact, and defendant is entitled to judgment as a matter of law, defendant's motion for summary judgment dismissing this claim is granted.

### 2. Unjust Enrichment

Under New York law, an unjust enrichment claim will lie if the plaintiff can show that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; (3) the circumstances were such that equity and good conscience require defendant to make restitution. *Dolmetta v. Uintah Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir.1983). Moreover, unjust enrichment is a quasi-contract claim that can ordinarily be invoked only in the absence of a valid, enforceable contract. *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1272 (S.D.N.Y.1991); *Clark–Fitzpatrick, Inc. v. Long Island R.R.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (N.Y.1987).

Relying on *Clark–Fitzpatrick,* defendant asserts that the existence of the letter agreement between plaintiff and defendant precludes plaintiff from recovering on its claim for unjust enrichment. According to defendant, plaintiff's claim must be dismissed because, as the New York Court of Appeals declared in *Clark–Fitzpatrick,* "[i]t is impermissible ... to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed...." *Clark–Fitzpatrick,* 521 N.Y.S.2d at 656.

We are not persuaded by defendant's argument. Here, although plaintiff seeks relief for breach of contract and fraud, it has not yet been determined with finality that there was a valid contract between the parties or that it has been breached. If it is determined that the letter agreement is not enforceable, then recovery under a theory of unjust enrichment may be proper. *Chrysler Capital Corp.,* 778 F.Supp. at 1272; *see Taylor & Jennings, Inc. v. Bellino Bros. Constr. Co.,* 106 A.D.2d 779, 483 N.Y.S.2d 813 (3d Dept.1984). Because defendant has neither adduced evidence that it was not unjustly enriched, nor established that it is entitled to judgment as a matter of law, dismissal of plaintiff's claim is inappropriate.

### E. *Breach of Fiduciary Duty*

In its complaint, plaintiff alleges that it and defendant were participants in a limited partnership. According to plaintiff, defendant thus owed it a fiduciary duty that defendant breached by pressuring plaintiff to accept the letter agreement, failing to reimburse plaintiff's expenses, and entering into an agreement with La Casa Castro and DELASA to plaintiff's exclusion. However, in its Memorandum of Law, plaintiff concedes that it never finalized or executed a limited partnership agreement with defendant. Plaintiff now contends that because it and defendant's predecessor, UTC, filed a certificate of limited partnership, "[a]t the very least, IEC and UTC/Trigen were joint venturers in the Project." Plaintiff's Memorandum at 44. Thus, plaintiff maintains that defendant's actions constituted a breach of its fiduciary duty as a joint venturer.

Under New York law, a joint venture "is in a sense a partnership for a limited purpose, and it has long been recognized that the legal consequences of a joint venture are equivalent to those of a partnership." [10] *Gramercy Equities Corp. v. Dumont,* 72 N.Y.2d 560, 534 N.Y.S.2d 908, 911,

---

**10.** The relevant indicia of a partnership are substantially the same as those of a joint venture. *Orderline Wholesale Dist., Inc. v. Gibbons, Green,*

*van Amerongen, Ltd.,* 675 F.Supp. 122, 126 (S.D.N.Y.1987). Accordingly, while this discussion focuses on whether the parties formed a

531 N.E.2d 629 (1988). A joint venture exists where

> the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their benefit. . . .

*Steinbeck v. Gerosa,* 4 N.Y.2d 302, 175 N.Y.S.2d 1, 13, 151 N.E.2d 170, 178 (1958) (quoting *Hasday v. Barocas,* 10 Misc.2d 22, 28, 115 N.Y.S.2d 209, 215 (Sup.Ct.N.Y.Co. 1952)). Specifically, in order to form a joint venture (1) two or more persons must enter into an agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses. *Itel Containers Int'l Corp. v. Atlanttrafix Express Serv. Ltd.,* 909 F.2d 698, 701 (2d Cir.1990). All of these elements must be present before joint venture liability may be imposed. *Id.*

Here, plaintiff has failed to raise a triable issue of fact as to the existence of a joint venture. While it is true that the parties filed a certificate of limited partnership and submitted their bid to CEL on behalf of the IEC/UTC limited partnership, plaintiff acknowledges that the parties never finalized the proposed written partnership agreement. Plaintiff's assertion to the contrary notwithstanding, these facts, without more, do not give rise to a reasonable inference that the parties entered into a joint venture.

While the failure to execute a written agreement is not dispositive of the fact that such an agreement was not formed orally, plaintiff must proffer some additional evidence to demonstrate that the parties did, in fact, agree to enter into a joint venture. *See Blank v. Nadler,* 143 A.D.2d 966, 967, 533 N.Y.S.2d 891, 892 (2d Dept.1988). We note

that Mr. McVay, who attended the sessions at which the parties unsuccessfully negotiated the proposed written agreement, acknowledges that, as of the time of those sessions, the parties had not reached a consensus on the terms of a joint venture. McVay Deposition at 194 attached as Exhibit 1 to Keenan Declaration. Moreover, plaintiff has cited no deposition testimony or other evidence suggesting that after CEL awarded the bid to the parties as independent entities, the parties continued to negotiate and eventually finalized the terms of the purported joint venture. Nor does plaintiff offer evidence demonstrating that the parties' conduct was consistent with that of participants in a joint venture. Rather, it appears that the parties dealt with each other at arms length and pursued their independent objectives with regard to the project.

Accordingly, defendant is entitled to summary judgment dismissing plaintiff's claim for breach of fiduciary duty.

### III. Defendant's Motion for Partial Summary Judgment

Defendant seeks partial summary judgment reducing plaintiff's claim from $228,100 to $114,050 for those counts, excluding Count I, of the complaint that this court declines to dismiss. According to defendant, although plaintiff alleges that it is entitled to $228,100 in damages for the expenses it incurred, plaintiff, in fact, only incurred $114,050 in expenses.

Defendant asserts, and plaintiff does not dispute, that half of the expenses claimed by plaintiff were amassed by Robert McVay, plaintiff's former vice president, after he resigned his position in January 1994.[11] The parties agree that subsequent to his resignation, Mr. McVay acted as an independent contractor on plaintiff's behalf and that on May 15, 1994, Mr. McVay, in writing, released plaintiff from "all debts, obligations, reckonings, promises, covenants, agreements, contracts ... both written and oral ... arising out of, or related in any way to ... the Project." Release dated May 15th attached as Exhibit 11 to Kehoe affirmation. Thus,

---

joint venture, the reasoning and conclusions are also applicable to plaintiff's original claim that a partnership existed.

**11.** Mr. McVay has since returned to his position at IEC.

**1202**

defendant concludes that the quantum of plaintiff's alleged damages should be reduced by the amount of the expenses attributable to Mr. McVay.

Plaintiff responds that "[n]otwithstanding any written releases ... IEC is obligated, based on a verbal commitment and its long standing relationship with Mr. McVay to pay his development expenses out of the proceeds of Trigen's reimbursement." Plaintiff's Memorandum at 45. Plaintiff also argues that defendant lacks standing to invoke the release between plaintiff and Mr. McVay.

The release executed by Mr. McVay is comprehensive and clearly manifests his intent to "release and forever discharge" plaintiff from all its debts and obligations arising out of the Salvadoran project. Moreover, the release expressly includes oral agreements within its ambit. Thus, we find incredible plaintiff's assertion that an oral agreement exists that provides for Mr. McVay's reimbursement and supersedes his May 15, 1994 release.

Because plaintiff concedes in its Local Rule 3(g) Statement that $114,050 of the $228,100 it claims as damages relates to Mr. McVay's expenses, and because, given the release signed by Mr. McVay, no reasonable jury could conclude that plaintiff is obligated to reimburse Mr. McVay, plaintiff is precluded from relying on Mr. McVay's expenses as a component of its damage claim. In addition, we reject plaintiff's contention that defendant has "no standing to assert" the release. It is true that defendant is not in a position to enforce the terms of the release. *See generally,* Calamari & Perillo, Contracts (3d ed. 1987) §§ 17–1 to 17–14. However, defendant does not rely on the agreement between plaintiff and Mr. McVay for the proposition that it releases defendant from its alleged reimbursement obligation. Rather, defendant offers the release as evidence that plaintiff, in fact, is not liable to Mr. McVay for his expenses and, therefore, that plaintiff may not claim them as damages. Accordingly, defendant's motion for partial summary judgment is granted.

## CONCLUSION

For the foregoing reasons, we grant defendant's motion for summary judgment dis-

missing plaintiff's claims for breach of oral contract, failure of consideration, and breach of fiduciary duty. We deny defendant's motion for summary judgment dismissing plaintiff's claims for breach of written contract, fraud, and unjust enrichment. As to the fraud claim, we deny defendant's motion to dismiss for failure to plead with particularity. Last, we grant defendant's motion for partial summary judgment on the issue of damages claimed by plaintiff in its fraud and unjust enrichment causes of action.

SO ORDERED.