**ADLER & SHAYKIN, a New York partnership, Plaintiff and Counterclaim Defendant,**

v.

**Linda J. WACHNER, Defendant and Counterclaim Plaintiff.**

**No. 87 Civ. 6938 (JMW).**

United States District Court, S.D. New York.

Dec. 12, 1988.

Russell E. Brooks, Milbank, Tweed, Hadley & McCloy, New York City, for defendant.

Joseph S. Allerhand, Weil, Gotshal & Manges, New York City, for plaintiff.

## OPINION AND ORDER

WALKER, District Judge:

Currently before the Court are cross motions for summary judgment made pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants defendant's motion. As a result, the Court need not address the Amended Counterclaims.[1]

## BACKGROUND

This case revolves around a series of agreements entered into by the parties: the plaintiff, Adler & Shaykin ("A & S"), a New York partnership between Frederick Adler and Leonard Shaykin that manages a leveraged buyout fund, the purpose of which is to acquire equity in a series of leveraged acquisitions; and the defendant, Linda Wachner, now a Los Angeles executive who was first employed by A & S in December of 1984. Wachner has moved for summary judgment and thus has the burden of establishing that no genuine dispute exists as to any material fact. See, e.g., Beyah v. Coughlin, 789 F.2d 986, 989 (2d Cir.1986). Moreover, "[a]mbiguities or inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the summary judgment mo-

tion." Project Release v. Prevost, 722 F.2d 960, 968 (2d Cir.1983).

Wachner and A & S entered into their first agreement ("the Retention Agreement") on December 14, 1984. By the terms of the Retention Agreement, Wachner was to identify potential acquisitions for A & S in the beauty market and then head the acquired company. A & S formed the Beauty Acquisition Corporation ("BAC") for that purpose. After several months, BAC agreed to buy Revlon's beauty and fragrances business ("the BAC Transaction"). However, by December of 1985, Wachner's Retention Agreement with A & S had expired; the BAC Transaction had collapsed due to Pantry Pride's acquisition of Revlon; and A & S faced a drawn out litigation against Revlon. The Retention Agreement between the parties had no provision that would entitle Wachner to any share of whatever break-up fees or damages A & S might eventually recover from Revlon. As a result, Wachner and Adler negotiated an agreement dated December 12, 1985 ("the 1985 Agreement"). That agreement addressed various distribution possibilities of any break-up fee received from Revlon.[2]

After several months of litigation, on December 2, 1986, Revlon paid a $23.7 million break-up fee ("the Settlement Amount") to A & S pursuant to the Settlement Agreement negotiated by the parties. A letter agreement between A & S and Wachner, dated December 5, 1986 ("the 1986 Agreement"), addressed her share of that fee. The 1986 Agreement runs a little longer than two full, single-spaced typewritten pages. Following an introductory paragraph that refers its readers to the 1985 Agreement as well as other relevant

---

**1.** Wachner's Counterclaims are pleaded in the alternative. The Court's disposition of her motion for summary judgment renders them moot.

**2.** Paragraph Three of the 1985 Agreement contained four subparagraphs that addressed the break-up fee:

a) First shall be deducted all expenses ...
b) Then shall be deducted any amounts due to the Banks and Equitable [A & S's lenders, who, as events turned out, were paid a separate break-up fee of $21.3 million by Revlon on October 27, 1986. This provision and the

separate break-up fee to the lenders in part form the basis for Wachner's counterclaims. See below.]
c) Then of the first $20,000,000 breakup fee or settlement paid, you shall be entitled to 25% of the net profits before allocution to limited partners.
d) Then of amounts in excess of such gross $20,000,000, you shall be entitled to 15% of the net profits computed after deduction of any payments made to limited partners.

agreements, the 1986 Agreement provides: "In view of the settlement provided in the Settlement Agreement, it is agreed as follows ..." The agreement between A & S and Wachner provides that, in consideration of $2.785 million to Wachner, she would release A & S and related entities from all actions and future demands regarding the Settlement Agreement. The 1986 Agreement also outlined in detail, with several formulae, an agreement between the parties that called for them to share whatever future taxes might be assessed against the Settlement Amount.

According to A & S, at the time of the 1986 Agreement, the parties entered into a separate oral "understanding." Wachner disputes this claim, but for the purposes of her motion for summary judgment, the Court accepts A & S's recitation of the facts. The terms of this "understanding" were that

> we [A & S] would pay her [Wachner] the amount she was entitled to receive under the formula we had worked out ($2,785,-000), based, however, on the planned distribution of $4,600,000 to the Limited Partners [from the aborted BAC Transaction]. In light of the fact that the Limited Partners were objecting to that distribution and might ultimately succeed in causing A & S to increase it, Wachner and I [Adler] further agreed that her share would be recalculated if and when we had to increase the payment to the Limited Partners and she would repay the difference.

Adler Aff. ¶ 15. Adler agreed to pay Wachner her share before a final determination of what the Limited Partners would get because Wachner "needed money. She owed a lot of money to the banks, money on which she was paying interest." Adler Dep. at 23–24. Adler and Wachner were also longtime friends. Wachner and Shaykin, however, were not on friendly terms. Indeed, he described how at times he had to withdraw from negotiations with Wachner over the 1985 Agreement because the negotiations had become "so acrimonious." Shaykin Dep. at 129. The two engaged in at least one "heated discussion." *Id.* at 56.

Because of his friendship with Wachner, Adler did not feel it was necessary to memorialize his further understanding with Wachner that she might return a portion of her share of the Settlement Amount. He and Wachner had a series of conversations during which she never questioned her obligation to return a portion of the money, but rather only questioned the amount. Wachner told Adler that she wanted to be kept advised of A & S's continued dealings with its Limited Partners. In her own words, she wanted "to see and understand any givebacks" to the "Limited Partners" and "wanted to be a part of it." Wachner Dep. at 144.

Furthermore, Adler felt it was unwise to raise the possibility of additional payments to A & S's limited partners "in a writing [ ] the Limited Partners had every right to view": "Such a provision would have fueled the dispute between A & S and the Limited Partners concerning how much the Limited Partners were to receive." Pl.'s Mem. in Opp. at 19–20.

As it turned out, on April 23, 1987, A & S paid its Limited Partners roughly $9.94 million, not $4.6 million. From the papers submitted, it remains unclear why A & S increased the distribution to its Limited Partners. At the hearing before this Court, A & S admitted that it has a continuing relationship with its Limited Partners, upon whom it expects to rely in future transactions. A & S offered nothing to contradict Wachner's assertion that A & S increased the payment to the Limited Partners in order to insure a continued harmonious and productive business relationship. Based upon the actual distribution, A & S notified Wachner that she owed an additional $810,375. By May of 1987, Shaykin, on behalf of A & S, forwarded to Wachner a "new Agreement prepared for the purpose of superceding [sic] [the 1986 Agreement]."

This May 1987 Agreement is virtually identical to the 1986 Agreement except for the fact that it takes into consideration Wachner's alleged oral agreement to return a portion of her distribution from the Settlement Amount in case A & S had to

pay more to its Limited Partners. As a result, it provides for Wachner to return $810,375 to A & S. The May 1987 Agreement states: "Except as expressly set forth herein, the 1986 Letter will remain in full force and effect (including but not limited to the release and tax indemnification provisions thereof)." The May 1987 Agreement, like all the previous agreements between the parties, did not contain a merger or integration clause.

Some time after the parties entered into the 1986 Agreement, Wachner repaid a $50,000 loan to A & S. The loan was originally made to cover expenses Wachner had incurred while working in New York for A & S on the proposed BAC Transaction.

A & S brought this action to recover that $810,375. Relying on the 1986 Agreement and the parol evidence rule, Wachner moved for summary judgment and, in the alternative, asserted as counterclaims her right to an additional $1.97 million, based upon what she argues is the correct calculation—given the formulae in the 1985 Agreement—of her share of the Settlement Amount. In addition to opposing Wachner's motion, A & S cross-moved for summary judgment on Wachner's amended counterclaims based on Wachner's release in the 1986 Agreement. After a careful reading of the parties' papers, depositions and affidavits; and after oral argument, the Court grants summary judgment for Wachner. Her counterclaims are thus moot.

## DISCUSSION

### A. The Parol Evidence Rule:

#### 1. Integration:

■ Where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing. *See, e.g., Marine Midland Bank–Southern v. Thurlow,* 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 419–420, 425 N.E.2d 805, 807–08 (1981). ("Although at times this

rule may seem to be unjust, 'on the whole it works for good' by allowing a party to a written contract to protect himself from 'perjury, infirmity of memory or the death of witnesses.' ") (citations omitted). *See also Meinrath v. Singer,* 482 F.Supp. 457, 460 (S.D.N.Y.1979) ("One of the oldest and most settled principles of New York law is that a party may not offer proof of prior oral statements to alter or refute the clear meaning of unambiguous terms of written, integrated contracts to which assent has voluntarily been given") (Weinfeld, J.) (footnote omitted), *aff'd* without op., 697 F.2d 293 (2d Cir.1982).

■ The party relying on the rule to bar the admission of evidence must first show that the agreement is integrated, which is to say, that the writing completely and accurately embodies all of the mutual rights and obligations of the parties. *See, e.g., Lee v. Joseph E. Seagram & Sons, Inc.,* 413 F.Supp. 693 (S.D.N.Y.1976), *affirmed,* 552 F.2d 447 (2d Cir.1977), *Mitchill v. Lath,* 247 N.Y. 377, 160 N.E. 646 (1928). And "under New York law a contract which appears complete on its face is an integrated agreement as a matter of law." *Battery S.S. Corp. v. Refineria Panama, S.A.,* 513 F.2d 735, 738 n. 3 (2d Cir.1975), *Happy Dack Trading Co., Ltd. v. Agro–Industries, Inc.,* 602 F.Supp. 986, 991 (S.D.N.Y.1984).

■ However, under New York law, in the absence of a merger clause, "the court must determine whether or not there is an integration 'by reading the writing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing.' " *Braten v. Bankers Trust Co.,* 60 N.Y.2d 155, 162, 468 N.Y.S.2d 861, 864, 456 N.E.2d 802, 805 (1983). The New York Court of Appeals long ago provided a guideline for this determination:

If upon inspection and study of the writing, read, it may be, in the light of surrounding circumstances in order [to determine] to its proper understanding and interpretation, it appears to contain the engagements of the parties, and to de-

fine the object and measure the extent of such engagement, it constitutes the contract between them, and is presumed to contain the whole of that contract.

*Eighmie v. Taylor*, 98 N.Y. 288 (1885), *Lee v. Joseph E. Seagram & Sons, Inc.*, 413 F.Supp. at 701 (citation omitted).

Factors New York courts consider include: whether the document in question refers to the oral agreement, or whether the alleged oral agreement between the parties "is the sort of complex arrangement which is customarily reduced to writing" *Manufacturers Hanover Trust Company v. Margolis*, 115 A.D.2d 406, 407–8, 496 N.Y.S.2d 36, 37 (1st Dep't 1985); whether the parties were represented by experienced counsel when they entered into the agreement, *Pecorella v. Greater Buffalo Press, Inc.*, 84 A.D.2d 950, 446 N.Y. S.2d 709 (4th Dep't 1981); whether the parties and their counsel negotiated during a lengthy period, resulting in a specially drawn out and executed agreement, and whether the condition at issue is fundamental, *Braten v. Bankers Trust Co.*, 60 N.Y.2d at 162, 468 N.Y.S.2d at 864, 456 N.E.2d at 805 (1983); if the contract, which does not include the standard integration clause, nonetheless contains wording like " '[i]n consideration of the mutual promises herein contained, it is agreed and convenanted as follows," and ends by stating that 'the foregoing correctly sets forth your understanding of our Agreement' ", *Lee v. Joseph E. Seagram & Sons*, 413 F.Supp. at 701.

■ Having examined both the document itself and the circumstances surrounding it, the Court concludes that the parties intended the 1986 Agreement to contain the mutual promises of the parties with respect to the Settlement Amount. It thus is a valid integrated agreement and the Court will exclude evidence of prior or contemporaneous negotiations or agreements which would vary or be inconsistent with its terms, as would the alleged oral understanding between Adler and Wach-

ner. The Court bases its decision on several grounds.

The document itself supports the Court's conclusion. Although the 1986 Agreement contains no merger clause, it does contain the words: "In view of the settlement provided in the Settlement Agreement, it is agreed as follows ...", and "Please confirm your agreement with the foregoing by signing and returning a copy of this letter ..." The words indicate an intention to address fully the issue of the Settlement Amount, and to be bound by the terms of the agreement. In addition, the superseding agreement proposed by A & S is virtually identical to the 1986 Agreement (with the exception of providing for Wachner's repayment of $810,375). The superseding agreement also contains a provision that explains, "Except as expressly set forth herein, the 1986 Letter will remain in full force and effect (*including but not limited to the release and tax indemnification provisions thereof*)." (emphasis added) The emphasized portion undercuts A & S's contention before this Court that the 1986 Agreement "merely contained two substantive provisions: a one-way release from Wachner to A & S in consideration of the payment of $2,785,000 and a 'tax indemnification' from Wachner to A & S in the event of an adverse tax ruling ..." Pl.'s Mem. at 16.

The presence of a one-way rather than a mutual release does not alter this Court's conclusion that the 1986 Agreement was integrated. The Court's own calculations, based on the formulae provided in the 1985 Agreement that govern potential break-up fees, convinces it that A & S had good reason to seek a release from Wachner. Simply put—and without passing judgment on this point—based on the 1985 Agreement, her share of the break-up fee arguably could have been significantly higher than the $2.785 million provided for in the 1986 Agreement.[3] There was no reason for Wachner to seek a release from A & S. The 1986 Agreement clearly addresses, and was clearly meant to address, a straightfor-

---

**3.** Indeed, Wachner's Counterclaims before this Court suggest just the sort of litigation one imagines A & S intended to avoid by securing her release.

ward transaction: in consideration for Wachner's release, A & S paid her $2.785 million.

Furthermore, the parties were represented and aided by experienced counsel in drafting the agreement at issue. *See* Shaykin Dep. at 67; 19; 135–36. The complex tax indemnification provision in the 1986 Agreement reveals their ability to address a potential recalculation of Wachner's share of the Settlement Amount when the parties so desired. Regardless of whether the oral agreement was made—and, for the purposes of this motion, the Court assumes that it was—the Court concludes that it remains just the sort of complex arrangement customarily reduced to writing and which the parties would ordinarily be expected to embody in the writing. *See Braten, supra; Manufacturer's Hanover Trust, supra.* It stretches credulity too far to believe that, after more than a year of work, Wachner would grant A & S what amounts to unlimited discretion to reduce the one thing she had to show for her work: $2.785 million. The surrounding circumstances convince the Court that the oral agreement was "so clearly connected with the principal transaction as to be part and parcel of it." *Mitchill v. Lath,* 247 N.Y. at 381, 160 N.E. 646.

The Court is unconvinced by A & S's contention that the parties had an ongoing relationship that was "never governed by the strict terms of contractual provisions." Pl. Mem. in Opp. at 3. That relationship, A & S alleges, is best illustrated by the $50,000 loan, made without an underlying written contract. The loan, however, concerned an entirely separate aspect of the parties' relationship and had nothing to do with the subject matter of the 1986 Agreement: Wachner's share of the Settlement Amount and her release of A & S from any future claims. As far as that subject is concerned, the 1986 Agreement remains integrated. Similarly, Wachner's continued interest in A & S's dealings with its Limited Partners does not alter the Court's analysis. For more than a year, she had worked on the proposed BAC Transaction with A & S. She and Adler were longtime friends. Her desire to "see and understand

any givebacks" and "to be a part of it," Wachner Dep. at 144, is not sufficient to change the Court's conclusion that the 1986 Agreement was integrated.

### 2. Whether the Agreement was Collateral:

Under certain circumstances, parol evidence may be admitted even if an agreement *is* integrated. First, parol evidence may come in if the alleged agreement is collateral, that is, "one which is 'separate, independent and complete ... although relating to the same object.'" *Lee v. Joseph E. Seagram & Sons, Inc.,* 413 F.Supp. at 701; *aff'd* 552 F.2d 447 (2d Cir.1977). Only where three conditions are met will the Court allow evidence in support of an allegedly collateral agreement. *Id.* The New York rule in this area was established early on in the leading case of *Mitchill v. Lath,* 247 N.Y. 377, 160 N.E. 646 (1928):

[B]efore such an oral agreement as the present is received to vary the written contract at least three conditions must exist, (1) the agreement must in form be a collateral one; (2) it must not contradict express or implied provisions of the written contract; (3) it must be one that parties would not ordinarily be expected to embody in the writing ... [The oral agreement] must not be so clearly connected with the principal transaction as to be part and parcel of it.

247 N.Y. at 380–81, 160 N.E. 646.

The alleged oral understanding at issue here is not collateral. As noted above, it is "part and parcel" of the underlying agreement, precisely the sort of provision "the parties would ordinarily be expected to embody in the writing." *See* discussion, *supra.* Moreover, A & S's explanations of the provision's absence are unconvincing. First, Adler's friendship with Wachner did not prevent him from having her execute at least three highly specific contracts. His friendship did not prevent him from explaining with precise formulae Wachner's exact share of any future taxes that might be levied against the Settlement Amount. A & S's reliance on

*Lee v. Joseph E. Seagram & Sons,* 552 F.2d 447 (2d Cir.1977), is misplaced. In that case, the Second Circuit allowed parol evidence in part because "there was a close relationship of confidence and friendhsip over *[thirty] years* between two old men [who were the parties to the alleged agreement at issue]". *Id.* at 452 (emphasis added). The Court does not believe that such a unique and longstanding relationship is currently before it. Moreover, the friendship between the parties in *Lee* was only one of several factors the court relied on in its determination to accept parol evidence. *Id.* And, as noted above, Adler's friendship with Wachner represents only half the story; Wachner's relationship with Shaykin was, by the parties' own testimony, not friendly.

Adler's fear of the Limited Partners is similarly unconvincing. Simply put, he and Wachner could have agreed that she would return a portion of her distribution *without* explicitly alerting the Limited Partners to this possibility. For instance, the 1986 Agreement could have provided that Wachner's distribution was "contingent on a planned distribution of $4.6 million to the Limited Partners," or it could have included a boilerplate conclusion that "this Agreement remains subject to a final accounting pursuant to the formulae contained in the 1985 Agreement." It did neither.

A & S's reliance on *Hicks v. Bush,* 10 N.Y.2d 488, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962) is also unpersuasive. In that case, the oral agreement in question was "the sort of condition which parties would not be inclined to incorporate into a written agreement intended for public consumption." *Id.* at 493, 225 N.Y.S.2d 34, 180 N.E.2d 425. The 1986 Agreement was *not* intended for "public consumption." And even if it *were* seen by A & S's Limited Partners, there is no reason why it would have to undermine A & S's interests. As noted above, it would not have been difficult to draft a contractual clause that at once both guaranteed that Wachner would return a portion of her payment in the event the Limited Partners received a greater share, and explained that A & S itself did not believe the Limited Partners were entitled to a greater share.

Finally, in the Court's judgment, the alleged oral understanding squarely contradicts the unambiguous terms of the 1986 Agreement.

*3. Ambiguity:*

█ Even if an agreement is integrated, parol evidence may be admitted if the underlying contract is ambiguous. *See, e.g., Ralli v. Tavern on the Green,* 566 F.Supp. 329, 331 (S.D.N.Y.1983) ("Where the language employed in a contract is ambiguous or equivocal, the parties may submit parol evidence concerning the facts and surrounding the making of the agreement in order to demonstrate the intent of the parties"); *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983) ("where contract language is susceptible of at least two fairly reasonable meanings, the parties have a right to present extrinsic evidence of their intent at the time of contracting"). As both sides agree, the traditional view is that the search for ambiguity must be conducted within the four corners of the writing. *See, e.g., Western Union Telegraph Co. v. American Communications Ass'n,* 299 N.Y. 177, 86 N.E.2d 162 (1949).

Under this analysis, it is self-evident that the 1986 Agreement is not ambiguous. There are no words or phrases that appear "susceptible of at least two fairly reasonable meanings." As discussed at length above, the fact that the agreement contains only a one-way release does not create any ambiguity.

*4. Fraud:*

█ "The parol evidence rule has no application in a suit brought to *rescind* a contract on the ground of fraud." *Sabo v. Delman,* 3 N.Y.2d 155, 161, 164 N.Y.S.2d 714, 717, 143 N.E.2d 906, 908 (1957) (emphasis in original). Under New York law, "to plead a prima facie case of fraud the plaintiff must allege representation of a material existing fact, falsity, scienter, deception and injury." *Lanzi v. Brooks,* 54 A.D.2d 1057, 1058, 388 N.Y.S.2d 946, 947

(3d Dep't 1976), *aff'd*, 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977); *Reno v. Bull*, 226 N.Y. 546, 550, 124 N.E. 144 (1919). "In short, a contractual promise made with the undisclosed intention not to perform it constitutes fraud and, despite the so-called merger clause, the plaintiff is free to prove that he was induced by false and fraudulent misrepresentations ..." *Sabo, supra*, 3 N.Y.2d at 162, 164 N.Y.S.2d at 718, 143 N.E.2d at 909.

However, Judge Weinfeld has explained what the fraud exception is *not* intended to reach:

> Although proof of fraud can vitiate an agreement, such proof may only be offered to show 'the intention of the parties that the *entire contract* was to be a nullity, not as here that only certain provisions of the agreement were to be enforced.' Here the plaintiff is not claiming that no agreement existed ... [H]e is not seeking rescission, but enforcement of the contract, albeit upon terms ... markedly different from those in the writing ... Here the plaintiff seeks materially to alter, by introducing prior parol evidence, a single unambiguously expressed item—the terms of compensation—in a comprehensive contract that includes [a merger clause]. To allow him to do so would be to eviscerate the parol evidence rule ...

*Meinrath, supra* at 460–61 (emphasis in original; footnotes omitted). In *Meinrath*, Judge Weinfeld thus rejected "plaintiff's attempt to avoid the strictures of the parol evidence rule by alleging fraudulent inducement." *Id.*

Judge Weinfeld's opinion in *Meinrath* is dispositive here. The Court will not allow the plaintiff to introduce parol evidence to alter the unambiguous terms of an integrated agreement.[4]

## B. The Remaining Counts:

A & S's action sounds primarily in contract. However, it has also alleged three additional counts: unjust enrichment, conversion and money had and received. Each of the additional counts represents an attempt to get through the back door a claim this Court will not allow through the front.

### 1. Unjust Enrichment and Quasi Contract:

■ The Court's decision on these issues turns on whether or not it concludes as a matter of law that the 1986 Agreement defined fully the relationship between the parties as far as the Settlement Amount was concerned. Since the Court has so found, a recent New York Court of Appeals case controls the present dispute. In *Clark–Fitzpatrick Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987), a unanimous court explained that "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." The court continued:

> A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment ...' Briefly stated, a quasi-contractual relationship is one imposed by law *where there has been no agreement or expression of assent, by word or act, on the part of either party involved.* It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.

*Clark–Fitzpatrick, supra* at 388–89, 521 N.Y.S.2d 653, 516 N.E.2d 190 (citations omitted; emphasis in original).

### 2. Conversion:

The Court has determined as a matter of law that Wachner had an absolute right based on an integrated agreement to the

---

**4.** Moreover, it appears that this claim fails for a pleading defect. Plaintiff did not amend its Complaint to assert a claim of fraud. Indeed, the circumstances surrounding fraud must be pleaded with particularity. *See* Rule 9(b), Federal Rules of Civil Procedure.

$2.785 million she received. Thus, no claim for conversion will lie. *See, e.g., Hinkle Iron Co. v. Kohn*, 184 A.D. 181, 183–84, 171 N.Y.S. 537 (1st Dep't), *reversed on other grounds*, 229 N.Y. 179, 128 N.E. 113 (1918) *Cf. Clark–Fitzpatrick, Inc., supra.* The result would be no different even if the oral understanding were allowed to vary the unambiguous terms of the integrated agreement. *See Hinkle Iron, supra* at 183–4, 171 N.Y.S. 537 ("The failure to pay it over was simply a breach of contract, and the plaintiff cannot, by changing the form of the action, change the nature of the defendant's obligation and convert into a tort that which the law deems a simple breach of an agreement …").

### 3. Money Had and Received:

The Court finds no colorable grounds for this equitable remedy.

> In an action for money had and received, the [movant] 'must show that it is against good conscience for [his adversary] to keep the money.' … [Such an action] is founded upon equitable principles aimed at achieving justice.

*Federal Insurance Co. v. Groveland State Bank*, 37 N.Y.2d 252, 258, 372 N.Y.S.2d 18, 21, 333 N.E.2d 334, 336 (1975). No material triable issue exists on this score. The alleged oral understanding between Adler and Wachner, which the Court assumes existed, does not dictate a contrary result. The parties are sophisticated businesspeople whose relationship was governed by detailed contracts. In fact, equity dictates that the parties honor their freely negotiated and integrated agreement of December 5, 1986.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted.

SO ORDERED.