David P. **MILLER**, Plaintiff,

v.

**HEKIMIAN LABORATORIES, INC.**, Defendant.

No. 1:01–CV–47 (FJS/DRH).

United States District Court, N.D. New York.

April 23, 2003.

Cooper, Erving & Savage LLP (Philip G. Steck, of counsel), Albany, NY, for Plaintiff.

Hogan & Hartson L.L.P. (John Houston Pope, of counsel) New York City, for Defendant.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

## I. INTRODUCTION

Plaintiff originally filed this action in state court. On January 10, 2001, Defendant removed the matter to this Court based upon diversity jurisdiction. Plaintiff's complaint asserts two causes of action: (1) breach of contract and (2) violations of New York Labor Law §§ 190(1), 191 and 193.

## II. BACKGROUND

By letter dated November 8, 1999, Defendant Hekimian Laboratories, Inc. ("Hekimian") offered Plaintiff a position as an Account Manager.[1] *See* Dkt. No. 23, Affidavit of David P. Miller, sworn to April 3, 2002 ("Miller Aff."), at Exhibit "F." Together with the offer letter, Defendant sent Plaintiff an Employment Agreement and a document entitled "2000 Incentive Compensation Plan." *See* Dkt. No. 36, Declaration of Kevin McCartney, dated April 2, 2002 ("McCartney Decl. I"), at ¶¶ 6–7 & Exhibits "B" & "C;" Miller Aff. at ¶ 14 & Exhibit "G." In addition, Hekimian asserts that it also sent Plaintiff a document entitled "David Miller, Account Manager—At-

---

1. Throughout his papers, Plaintiff asserts that Hekimian hired him as a "commission salesperson." It is clear from all the documents submitted to the Court, however, that, although Hekimian may have paid Plaintiff commissions in addition to his base salary, he was hired as an "Account Manager."

lantic Region," hereinafter referred to as the "Bonus Plan." *See* Miller Aff. at ¶¶ 20–24 & Exhibit "K;" McCartney Decl. I at ¶¶ 8–9 & Exhibit "D." Plaintiff does not recall receiving the Bonus Plan in November 1999, although he does concede that Mr. McCartney handed him that Plan in early January 2000. *See* Miller Aff. at ¶ 20.

At the crux of the parties' dispute is the relationship among and relevance of the Employment Agreement, the 2000 Incentive Compensation Plan, and the Bonus Plan. The Employment Agreement, which Plaintiff signed on December 13, 1999, his first day of work at Hekimian, provides, in pertinent part, that

1. *Salary, Duties, Expenses, Vacation and Travel.*

(a) The Corporation agrees to employ the Employee and the Employee agrees to accept employment by the Corporation on a full-time basis as *an Account Manager* of the Corporation, at a minimum annual salary of *$80,000.00* payable during the Term of Employment (as defined in Section 2 hereof). Such salary shall be payable in equal installments during each month or such other pay periods established from time to time by the Corporation, pursuant to its standard employment practices. During the Term of Employment, the Employee shall be governed by the Corporation's policies applicable to other employees of the Corporation with respect to periodic reviews and increases in salary and fringe benefits, as hereinafter described, provided for such employees.

\* \* \* \* \* \*

3. *Fringe Benefits.* Nothing contained herein shall detract from or limit, during the Term of Employment, the Employee's participation in any group insurance, hospitalization, retirement or other benefit plan or other arrangement avail-able to all employees of the Corporation. **The Employee's participation in other benefits or incentive payments shall be at the discretion of the Board of Directors or the President of the Corporation or his designee.**

\* \* \* \* \* \*

11. *Entire Agreement.* The foregoing contains the entire agreement between the parties relating to the subject matter of this Agreement, and may not be altered or amended except by an instrument in writing signed by both parties hereto, and this Agreement **supersedes all prior understandings and agreements relating to employment of the Employee by the Corporation.**

*See* McCartney Decl. I at Exhibit "C" at ¶¶ 1(a), 3, 11 (emphasis added).

The 2000 Incentive Compensation Plan provides as follows:

David Miller
ACCOUNT MANAGER
2000 Incentive Compensation Plan
2000 Quota—*to be determined*

1. All bookings will be commissioned at 0.5%.

2. All bookings over quota will be commissioned at an additional 0.25%.

3. After achieving 100% of bookings quota, a $5,000 bonus will be issued.

*See* Miller Aff. at Exhibit "G;" McCartney Decl. I at Exhibit "B."

Finally, the Bonus Plan provides that

| | |
|---|---|
| Base Salary– | $80,000 |
| Quota– | To be assigned for 2000 |
| Assigned accounts– | Bell Atlantic North |
| Commission– | 0.5% for all bookings in assigned accounts |

Other Incentives–

The following incentives will be paid for satisfactory implementation and support of the Bell Atlantic North REACT 2001 and DSL projects and a satisfactory performance rating at the date of the bonus

payment. **These bonuses are gross amounts and will be issued on the payroll following the computation of bookings by the Accounting Department after the corresponding date(s) above, so long as the employee is on Hekimian's payroll on the incentive date.** No pro-ration will apply based upon partial completion of the period.

June 20, 2000– $7,500
December 31, 2000– $7,500
June 30, 2001– $7,500
December 31, 2001– $7,500

"Satisfactory implementation and support" will be clearly defined in a job performance agreement to be executed within 60 days of employee's start date. In general terms, "satisfactory implementation and support" refers to:

- Managing customer expectations and issues,

- Positive promotion of features and benefits to new customer base,

- Assisting the implementation and support team, and

- Managing Hekimian's internal organizations to meet the customer's needs and terms of the contract

*See* McCartney Decl. I at Exhibit "D" (emphasis added).

Plaintiff relies upon the 2000 Incentive Compensation Plan as the basis for his claim that Hekimian has breached its agreement to pay him commissions on all "bookings," including the Test DSL Contract, in the year 2000. In addition, Plaintiff argues that, based upon a conversation he had with his supervisor, Kevin McCartney, in December 1999, in which he was told that there would be no quota for the remainder of that year, he expected to be paid 0.5% commission on all bookings for the period December 13–31, 1999, including that portion of the Test DSL Contract that was "booked" during that time.

To the contrary, Hekimian argues that section 11 of the Employment Agreement provides that this is the only Agreement between the parties with respect to the issue of Plaintiff's employment and, therefore, this is the only relevant document in this case. In addition, Hekimian asserts that since the Employment Agreement states that it is within Hekimian's discretion to establish Plaintiff's incentive payments, Plaintiff cannot rely upon the 2000 Incentive Compensation Plan as a basis for his claims.

Presently before the Court are three motions: (1) Plaintiff's motion for summary judgment, (2) Defendant's motion for summary judgment, and (3) Defendant's motion *in limine* to preclude Plaintiff's expert, Don E. Smith, from testifying at trial. The Court will address each of the issues raised in these motions in turn.

## III. DISCUSSION

### A. Summary judgment standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the non-moving party based on the evidence presented, the legitimate inferences drawn from that evidence in favor of the non-moving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Plaintiff's breach of contract claims

Plaintiff's breach of contract claims can be divided into three categories: (1) his claim for commissions on any orders

"booked" in 1999; (2) his claim for commissions on any orders that "booked" in 2000 under the terms of the 2000 Incentive Compensation Plan; and (3) his claim for commissions on the Test DSL Contract. Resolution of these claims requires the Court to answer two questions: (1) whether the Employment Agreement that Plaintiff signed on December 13, 1999, the day he began employment with Hekimian, superceded the 2000 Incentive Compensation Plan, which Plaintiff received with his offer letter in November 1999, and, if not, (2) the meaning of the term "bookings" as used in the 2000 Incentive Compensation Plan and the Bonus Plan.

### 1. The Employment Agreement

■ Plaintiff does not dispute that he signed the Employment Agreement on December 13, 1999, or that section 11 of the Employment Agreement contains an integration clause. Nonetheless, Plaintiff asserts that Hekimian was obligated to pay him commissions under the terms of the 2000 Incentive Compensation Plan because (1) the Employment Agreement envisions a commission plan; (2) parol evidence is admissible to fill in the particulars as to subject matter which is referred to in an agreement as long as there is no contradiction of the agreement itself; and (3), if the promise of commission is ignored, Plaintiff was fraudulently induced to accept employment with Hekimian. *See* Dkt. No. 42 at 13–14.[2] Therefore, Plaintiff argues that parol evidence does not bar the Court from considering the 2000 In-

centive Compensation Plan because it is consistent with and complimentary to the Employment Agreement. *See* Dkt. No. 42 at 14.

To the contrary, Hekimian argues that the 2000 Incentive Compensation Plan and the alleged oral conversation that Plaintiff had with Mr. McCartney in December 1999 to the effect that there would be no quota for the remainder of 1999 are irrelevant because they predated the execution of the Employment Agreement and were not adopted by or ratified in that Agreement. Therefore, Hekimian argues that the Employment Agreement's integration clause bars consideration of these other agreements. Moreover, Hekimian asserts that the exception to integrated agreements that allows the enforcement of agreements wholly collateral to an integrated agreement does not apply here because for an agreement to be truly collateral it must concern a matter that one would not reasonably expect to have been within the contemplation of the parties as a subject of possible inclusion in the integrated agreement. *See* Dkt. No. 39 at 12–13.

Alternatively, Hekimian argues that, even if the collateral agreement exception applies to this case, the 2000 Incentive Compensation Plan conflicts with section 3 of the Employment Agreement, which gives management the sole discretion to determine Plaintiff's incentive payments. Hekimian claims that a clause such as section 3, conferring discretion on manage-

---

**2.** Plaintiff's statement that, if the promise of commission is ignored, he was fraudulently induced to accept employment with Hekimian appears to be a claim to rescind the Employment Agreement. Setting aside for the moment that Plaintiff has not alleged such a claim in his complaint, Plaintiff may not rely upon this argument to show that only certain provisions of the Employment Agreement should not be enforced. As the court ex-

plained in *Meinrath v. Singer Co.,* 482 F.Supp. 457 (S.D.N.Y.1979), "[a]lthough proof of fraud can vitiate an agreement, ... such proof may only be offered to show 'the intention of the parties that the Entire contract was to be a nullity, not as here that only certain provisions of the agreement were to be enforced.'" *Id.* at 460 (internal footnote and other footnote omitted).

ment over an item of compensation, excludes the possibility of a separate agreement fixing the rate of compensation on that subject. *See* Dkt. No. 39 at 14. Finally, Hekimian asserts that the mention of incentive payments in Section 3 is more than adequate to demonstrate that the integration clause was intended to extinguish the legal force of any prior agreement applicable to commissions.

■ "Where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing." *Adler & Shaykin v. Wachner*, 721 F.Supp. 472, 476 (S.D.N.Y.1988) (citations omitted); *Bernstein v. Kapneck*, 290 Md. 452, 460, 430 A.2d 602 (1981) (citation omitted) ("[A]s a matter of substantive law, parole [sic] evidence ordinarily is inadmissible to vary, alter or contradict a contract, . . . that is complete and unambiguous . . . ." (quotation omitted)).[3]

■ In the present case, there is no dispute that the Employment Agreement is an integrated agreement. This, however, does not end the Court's inquiry because there is an exception to the parol evidence rule, which permits a court to consider and to enforce an agreement that is collateral to an integrated agreement. *See Adler & Shaykin*, 721 F.Supp. at 478. Thus, parol evidence is admissible "if the alleged agreement is collateral, that is, 'one which is "separate, independent and complete . . . although relating to the same object." ' " *Id.* (quoting *Lee v. Joseph E.*

*Seagram & Sons, Inc.*, 413 F.Supp. 693, 701 (S.D.N.Y.1976); *aff'd*, 552 F.2d 447 (2d Cir.1977)). However, three conditions must be met before a court will allow parol evidence to support an allegedly collateral agreement: " '(1) the agreement must in form be a collateral one; (2) it must not contradict express or implied provisions of the written contract; [and] (3) it must be one that parties would not ordinarily be expected to embody in the writing . . . .' " *Id.* (quoting [*Mitchill v. Lath,*] 247 N.Y. 377 at 380–81, 160 N.E. 646 (1928)).

■ To determine whether Plaintiff may rely upon the 2000 Incentive Compensation Plan as a basis for his breach of contract claims, the Court must first decide whether that Plan, which Plaintiff received **prior to** signing the Employment Agreement, is a collateral agreement. The New York Court of Appeals addressed this issue under similar circumstances in *Namad v. Salomon Inc.*, 74 N.Y.2d 751, 545 N.Y.S.2d 79, 543 N.E.2d 722 (1989). In that case, the employment contract provided that " '[t]he amounts of other compensation and entitlements, if any, including regular bonuses, special bonuses and stock awards, **shall be at the discretion of the management** . . . . Such bonuses as are awarded will be consistent with the customary policy of the company.' " *Id.* at 752–53, 545 N.Y.S.2d 79, 543 N.E.2d 722 (emphasis added). The plaintiff sued on the contract alleging that he received less compensation in the form of bonuses than was the "customary policy of the company." On appeal, the Court of Appeals addressed the following issues: (a) "whether parol evidence is required to interpret

---

**3.** The Employment Agreement has a choice-of-law provision, which provides that "[t]his Agreement and the rights and obligations of the parties hereunder shall be construed, interpreted and enforced in accordance with, and governed by the laws of, the State of Maryland . . . ." *See* McCartney Decl. I at Exhibit "C" at § 9. Like New York's, Maryland's parol evidence rule precludes parol evidence of all prior or contemporaneous agreements offered to contradict or modify the terms of an integrated agreement. *Cf. Creamer v. Helferstay*, 294 Md. 107, 118, 448 A.2d 332 (1982) (citation and footnote omitted).

the contract's bonus clause" and (2) "whether plaintiff presented evidentiary facts sufficient to defeat defendants' motion for summary judgment dismissing the complaint." *Id.* at 753, 545 N.Y.S.2d 79, 543 N.E.2d 722. The court held that "[b]ecause the bonus clause is reasonably susceptible of only one interpretation, which may be gleaned from the face of the contract, the Appellate Division properly denied the admission of extrinsic evidence and granted defendants' motion for summary judgment." *Id.* at 753, 545 N.Y.S.2d 79, 543 N.E.2d 722 (citation omitted).[4] Likewise, in *O'Shea v. Bidcom, Inc.,* No. 01 Civ. 3855, 2002 WL 1610942 (S.D.N.Y. July 22, 2002), the court noted that "[i]t is axiomatic that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive." *Id.* at *3 (citations omitted).

Although section 3 of the Employment Agreement does not set forth the specific provisions of an incentive plan, it unambiguously vests discretion regarding Plaintiff's participation in incentive payments in Hekimian's management. *See* McCartney Decl. I at Exhibit "C" at § 3.[5] Thus, Plaintiff cannot rely upon the 2000 Incentive Compensation Plan's purported promise to pay him a specific commission to contradict that section. If the Court were to

enforce the 2000 Incentive Compensation Plan, it would, in effect, amend the Employment Agreement in such a way as to deny Hekimian's management the discretion with which section 3 unambiguously vests them. The Court cannot do this. *See O'Shea,* 2002 WL 1610942 at *3.

Since the terms of the 2000 Incentive Compensation Plan contradict the express terms of the Employment Agreement, the Court concludes that this Plan is not collateral to the Employment Agreement. Thus, the Employment Agreement is the only document to which Plaintiff can look to determine the terms of his employment relationship with Hekimian, including his entitlement to commissions. Plaintiff has produced no evidence to demonstrate that Hekimian breached that Agreement. Accordingly, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment with respect to Plaintiff's breach of contract claims.

### 2. The 2000 Incentive Compensation Plan and the Bonus Plan

 In the alternative, the Court will assume for the sake of argument that, rather than contradicting section 3 of the Employment Agreement, the 2000 Incentive Compensation Plan is a collateral agreement.[6] Relying upon this Plan,

---

4. The court also noted that "[w]here, as here, 'a written agreement between sophisticated, counseled businessmen is unambiguous on its face,' plaintiff 'cannot defeat summary judgment by a conclusory assertion that ... the writing did not express his own understanding of the oral agreement reached during negotiations.' " *Namad,* 74 N.Y.2d at 753, 545 N.Y.S.2d 79, 543 N.E.2d 722 (citation omitted).

5. Moreover, despite Plaintiff's assertion to the contrary, there is nothing in the Employment Agreement to prevent Hekimian from chang-

ing the terms of an incentive plan at its discretion.

6. There is absolutely no legal basis for Plaintiff's claim that he can rely upon Mr. McCartney's oral statement that there would be no quota for the remainder of 1999 as a basis for his claim that he was entitled to commissions on any booking that occurred between December 13, 1999, and December 31, 1999. The Employment Agreement unambiguously provides that it "may not be altered or amended except by an instrument in writing signed by both parties hereto[.]" *See* McCartney Decl. I at Exhibit "C" at § 11. Moreover,

Plaintiff asserts that, once he began working for Hekimian, in reliance upon this Plan as well as the Employment Agreement, he was entitled to commissions on all bookings, including the Test DSL Contract, consistent with the terms of the 2000 Incentive Compensation Plan throughout the term of his employment with Hekimian.[7] This argument does not withstand scrutiny. First, the 2000 Incentive Compensation Plan, by its very terms, applies only to bookings in the year 2000. Thus, although Hekimian may have paid Plaintiff for some bookings in December 1999, it was under no contractual obligation to do so and, under section 3 of the Employment Agreement, it was entirely within Hekimian's discretion to determine on which 1999 bookings it would pay Plaintiff commissions and the amount of those commissions. Thus, Plaintiff's claim that Hekimian breached its contract with him by not paying him commissions on the part of the Test DSL Contract that booked in December 1999 is totally without merit.

■ Second, as noted, there is nothing in section 3, or any other section, of the Employment Agreement that requires Hekimian to pay Plaintiff commissions on all bookings during the initial term of his employment, i.e., from December 13, 1999 to December 12, 2000. Since section 3 vests Hekimian's management with sole discretion to determine whether Plaintiff would participate in any incentive payments, Hekimian had the authority to determine what those incentive payments would be at any time. Thus, Hekimian's decision to pay commissions to Plaintiff at

a rate of 0.5% for all assigned accounts, i.e., Bell Atlantic North accounts, and to pay him a bonus "for satisfactory implementation and support of the Bell Atlantic North REACT 2001 and DSL projects," *see* McCartney Decl. I at Exhibit "D," was not a breach of the Employment Agreement. Moreover, because under the Bonus Plan Hekimian was required to pay bonuses on the "Bell Atlantic North REACT 2001 and DSL projects ... [only] so long as [Plaintiff] is on Hekimian's payroll on the incentive date [and][n]o proration will apply based upon partial completion of that period," *see* McCartney Decl. I at Exhibit "D," Hekimian did not breach the Bonus Plan when it paid him $7,500 on June 20, 2000, with respect to those specified projects and did not make any other payments to Plaintiff with respect to those projects after Plaintiff left its employ in August 2000.

### 3. The meaning of the term "bookings"

■ The last question that the Court must determine, again assuming that either the 2000 Incentive Compensation Plan and/or the Bonus Plan are relevant to a determination of Plaintiff's breach of contract claims, is whether the term "bookings" as used in those two plans is ambiguous.

■ "The construction of a written contract is a question of law[.]" *Young v. Anne Arundel County*, 146 Md.App. 526, 585, 807 A.2d 651 (Ct.Spec.App.2002) (citations omitted). In construing a contract, a

the 2000 Incentive Compensation Plan, upon which Plaintiff relies to support his claim for commissions on 1999 bookings, by its very terms, applies **only** to the year 2000.

7. Pursuant to the Employment Agreement, "Term of Employment" is defined as an initial "period beginning *December 13, 1999* and ending *December 12, 2000* (or any earlier date

of termination of the Employee pursuant to the terms hereof or by mutual agreement). The Term of Employment may be extended for successive one-year or six-month periods thereafter by written agreement between the Corporation and the Employee." *See* McCartney Decl. I at Exhibit "C" at § 2(a).

court "seek[s] to ascertain and effectuate the intention of the contracting parties." *Id.* (citations omitted). "Moreover, 'the primary source for determining the intention of the parties is the language of the contract itself.'" *Id.* (quotation omitted).

Courts, however, do not interpret contracts in a vacuum but rather in their entirety. *See id.* (quotation omitted). "Ordinarily, the terms of a contract are construed consistent with their usual meaning, unless it is apparent that the parties ascribed a special or technical meaning to them." *Id.* (citations omitted). Courts in Maryland, like those in New York, adhere to the "objective law of contract interpretation" and, thus, "the court is required to 'give effect to [the contract's] plain meaning,' without regard to what the parties to the contract thought it meant or intended it to mean." *Id.* (quotation and citations omitted). In general, "'it must be presumed that the parties meant what they expressed.'" *Id.* (quotation and citation omitted). Thus, "the 'true test of what is meant is ... what a reasonable person in the position of the parties would have thought' the contract meant." *Id.* (quotation omitted).

If a contract is clear and unambiguous, the court may determine its construction, *see id.* (quotation omitted), and "[w]hether a contract is ambiguous is a question of law[.]" *Id.* at 587, 807 A.2d 651 (citation omitted). A contract "is considered ambiguous when the words in it are susceptible of more than one meaning to a reasonably prudent person." *Id.* (citations omitted). However, "[a] contract is **not** ambiguous, ..., merely because the parties to it do not agree as to its meaning." *Id.* (citation omitted) (emphasis added).

"To determine if contractual language is susceptible of more than one meaning, a court reviews the contract itself." *Id.* (citation omitted). In making this determination, the court "must also consider 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.'" *Id.* (quotation omitted). Finally, although it is not the court's job "to rewrite an agreement to rectify an ambiguity, to avoid hardship to a party, or because one party has become dissatisfied with its terms," *id.* (citations omitted), if a court determines that a contract is ambiguous, the court may consider parol evidence to clarify its meaning. *See id.* (citations omitted).

In the present case, the term "bookings" is not defined in either the 2000 Incentive Compensation Plan or the Bonus Plan. Hekimian argues that the term "bookings" refers to sales orders that have invoiced and that this definition is consistent with Plaintiff's expert's conclusion that a booking occurs at the point at which a company records an order on its books as revenue that it expects to collect. Hekimian asserts that, as a matter of accounting practice, it does not record any revenue from a sales order until it issues an invoice. Finally, Hekimian contends that it has always paid commissions to all of its Account Managers, including Plaintiff, according to this practice.

On the other hand, to support his argument that a booking is synonymous with a purchase order, Plaintiff relies upon the dictionary definition of booking: "'to register ... for some future activity or condition.'" *See* Dkt. No. 22 at 9 (quoting Merriam Webster [*www.m-w.com*]). Thus, according to Plaintiff, "[a] booking ... refers to some performance (such as a shipment) which will occur in the future. It does not designate the performance of the obligation itself and can be cancelled before performance actually takes place."

*See* Dkt. No. 22 at 9. Therefore, Plaintiff argues that he was entitled to commissions on all orders that Hekimian received, not the orders that Hekimian shipped, which is how he interprets Hekimian's definition of the term "booking."

Plaintiff also relies upon the opinion of his expert, Don E. Smith, that bookings are "the value of customer orders that have been accepted (booked) by the seller, in this case Hekimian. Commissions based on bookings would be paid on the amount of bookings." *See* Miller Aff. at Exhibit "O," Expert Report of Don E. Smith, at 1. Based upon this statement, Plaintiff argues that a "booking" is the same as the receipt of an "order." This argument, however, ignores the fact that, in his report, Mr. Smith distinguishes between the terms "orders" and "bookings" by opining that "[c]ommissions may be paid based on **orders, bookings, shipments, invoices and collections**. Each of these terms has a commonly accepted meaning to persons involved in sales, . . ." *Id.* (emphasis added).[8] Thus, it is clear that, unlike Plaintiff, Mr. Smith does not equate the receipt of an order with a booking.

Since neither the 2000 Incentive Compensation Plan nor the Bonus Plan define the term "bookings," there is no way that the Court can determine whether that term is susceptible of more than one reasonable meaning. Thus, the Court may consider parol evidence to clarify the meaning of the term "bookings" as it is used in these plans and, thereby, determine whether the plans are ambiguous.

Hekimian has provided the Court with evidence that demonstrates that it was Hekimian's practice to equate bookings with invoices; i.e., an order was booked when it invoiced because that was the time at which Hekimian recorded revenue from an order. *See* Dkt. No. 37, Declaration of Elizabeth Reynolds, dated April 3, 2002, at ¶ 7. Hekimian has also provided the Court with an economic rationale for defining a booking in this manner, which Plaintiff has acknowledged—the lead time on manufacturing equipment was often several months and account managers had to hold the customer committed to the sale during that period. *See* Transcript of Deposition of David P. Miller, dated July 11, 2001 ("Miller Tr.") at 155 ("They booked some orders in March that the only way they got shipped, I think it was in June or July, was because I essentially hand-held the customer and got them to revise orders and got [Hekimian] to ship equipment out, because they couldn't build equipment."); Dkt. No. 25, Second Declaration of Kevin McCartney, dated May 14, 2002, at ¶ 3 ("[Hekimian] pay[s] the commission at the time of invoice, for the amount invoiced, because that represents the confirmed value of an order in an industry where there is a high frequency of orders that undergo substantial change between inception and fulfillment."); McCartney Decl. I at ¶ 10 ("I explained to [Plaintiff] that [Hekimian] paid commissions when orders invoiced and not before. I told him that [Hekimian] did not consider an order to be a 'booking' until it invoiced. I explained that it was the nature of our business that there is a delay between when an order is submitted and when the product is manufactured and shipped, which is when it was invoiced and when we got paid commission."). Moreover, it is not disputed that, throughout Plaintiff's employment, Hekimian always paid commissions to him, as well as to its other Account Managers, who

---

8. Mr. Smith does not define the term "orders" in either his expert report or in his deposition testimony.

were also paid commissions based upon bookings, when the orders were invoiced.

In contrast to this evidence, Plaintiff offers nothing more than a dictionary definition of the term "booking" and the testimony of his expert Don E. Smith. As noted above, unlike Plaintiff, Mr. Smith differentiates between an order and a booking. *See* Transcript of Deposition of Don E. Smith, dated December 18, 2001, at 60. At his deposition, Mr. Smith explained that an order is something that a salesperson receives from a customer and a booking occurs when the salesperson's company accepts the order. *See id.* In addition, he stated that "[e]ach company would have their own systems and procedures" to determine when an order is accepted. *See id.* at 61. Thus, Mr. Smith noted that "there would be a lot of things that could describe [a booking]," including the point at which a company records an order as revenue it expects to receive from its customer. *See id.* at 62–63.

▮ Having reviewed the evidence that the parties have submitted, the Court concludes that the term "bookings" as used in the 2000 Incentive Compensation Plan and the Bonus Plan is susceptible of only one reasonable meaning—a booking is an order that has invoiced. Plaintiff has failed to demonstrate, in any meaningful way,

that, in the context of this employment relationship with Hekimian, his interpretation of the term "bookings" is a reasonable one. Moreover, the fact that Plaintiff may have subjectively understood the term "bookings" to have a different meaning does not render either the 2000 Incentive Compensation Plan or the Bonus Plan ambiguous. Accordingly, because there is no dispute that Plaintiff was paid all the commissions that he was owed on orders that had invoiced, i.e., booked, prior to the termination of his employment, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment with respect to Plaintiff's breach of contract claims.

## C. Plaintiff's Labor Law claims

Plaintiff's claims asserted under §§ 190, 191 and 193 of New York Labor Law, as well as his claims for attorneys' fees and liquidated damages under § 198 of New York Labor Law, need not detain the Court for long.[9] These claims suffer from the same flaws, and require the same result, as Plaintiff's breach of contract claims.

▮ First, to the extent that the Employment Agreement provides the only basis for his claims, Plaintiff has no contractual claim to the commissions he seeks in

---

9. Section 190 of New York Labor Law is a definitional section and provides no basis for a substantive cause of action. *See* N.Y. Lab. Law § 190 (McKinney 2002). Section 191 provides, in pertinent part, that "1. Every employer shall pay wages in accordance with the following provisions: ... (c) ... A commission salesman shall be paid the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment, but not less frequently than once in each month and not later than the last day of the month following the month in which they are earned ...." N.Y. Lab. Law § 191(1)(c) (McKinney 2002). Section 193 provides that

an employer shall not make any deductions from wages, which include commissions, with exceptions that are not relevant here. *See* N.Y. Lab. Law § 193 (McKinney 2002). Finally, section 198 provides, in pertinent part, that "1-a. In any action instituted upon a wage claim by an employee ... in which the employee prevails, the court shall allow such employee reasonable attorney's fees and, upon a finding that the employer's failure to pay the wage required by this article was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due." N.Y. Lab. Law § 198(1-a) (McKinney 2002).

this action. As noted, section 3 of the Employment Agreement vests Hekimian's management with the discretion to determine Plaintiff's participation in incentive payments; and Hekimian has met its obligations under this Agreement. Thus, without an enforceable contractual claim to the commissions he seeks, Plaintiff has no claim to those commissions under New York Labor Law. *See Tierney v. Capricorn Investors, L.P.*, 189 A.D.2d 629, 632, 592 N.Y.S.2d 700 (1st Dep't 1993) ("The plaintiff cannot assert a statutory claim for wages under the Labor Law if he has no enforceable contractual right to those wages.").

Alternatively, to the extent that Plaintiff can rely upon either the 2000 Incentive Compensation Plan and/or the Bonus Plan as the contractual basis for the commissions he seeks, he has received all of the commissions and bonuses to which he is entitled under both of these plans. *See* Part B *supra*. Therefore, because Hekimian has not failed to pay Plaintiff the wages he is due, Hekimian has not violated New York Labor Law.

Finally, because Plaintiff cannot establish a violation of a substantive provision of article 6 of New York Labor Law, he cannot recover attorneys' fees or liquidated damages under § 198. *See Gottlieb v. Kenneth D. Laub & Co., Inc.*, 82 N.Y.2d 457, 464, 605 N.Y.S.2d 213, 626 N.E.2d 29 (1993) ("the statutory remedy of an award of attorney's fees ... as well as the liquidated damages remedy where a willful failure to pay wages has been established, are limited to actions for wage claims founded on the substantive provisions of Labor Law article 6").

Accordingly, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment with respect to Plaintiff's claims under New York Labor Law.

**D. Defendant's motion *in limine* to preclude Plaintiff's expert from testifying at trial**

In light of the Court's decision that Defendant is entitled to summary judgment, the Court need not address Defendant's motion *in limine*. Accordingly, the Court denies Defendant's motion to preclude Plaintiff's expert from testifying at trial as moot.

## IV. CONCLUSION

After carefully considering the file in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendant's motion for summary judgment is **GRANTED** in its entirety; and the Court further

**ORDERS** that Plaintiff's motion for summary judgment is **DENIED** in its entirety; and the Court further

**ORDERS** that Defendant's motion *in limine* to preclude Plaintiff's expert from testifying at trial is **DENIED AS MOOT**; and the Court further

**ORDERS** that the Clerk of the Court is to enter judgment in Defendant's favor and close this case.

**IT IS SO ORDERED.**